1  Fred Norton (SBN 224725)
   fnorton@nortonlaw.com
2  Bree Hann (SBN 215695)
   bhann@nortonlaw.com
3  Nathan Walker (SBN 206128)
   nwalker@nortonlaw.com
4  Gil Walton (SBN 324133)
   gwalton@nortonlaw.com
5  Celine G. Purcell (SBN 305158)
   cpurcell@nortonlaw.com
6  Josephine Petrick (SBN 280233)
   jpetrick@nortonlaw.com
7  THE NORTON LAW FIRM PC
   299 Third Street, Suite 200
8  Oakland, CA 94607
   Telephone: (510) 906-4900
9
   Attorneys for Defendants
10 COINBASE, INC. and
   COINBASE GLOBAL, INC.
11

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                          OAKLAND DIVISION

15

16 MANISH AGGARWAL and MOSTAFA EL          Case No.
   BERMAWY, and AMISH SHAH, on behalf of
17
   the California public,
18                                          **DECLARATION OF CELINE G. PURCELL
                 Plaintiffs,                IN SUPPORT OF DEFENDANTS COINBASE,
19                                          INC. AND COINBASE GLOBAL, INC.
                                            REMOVAL OF ACTION**
20        v.
                                            (San Francisco Superior Court Case No. CGC23-
21 COINBASE, INC. and COINBASE GLOBAL,      603871)
   INC.,
22
                                            Action Filed: January 6, 2023
23               Defendants.                Trial Date: None Set

24

25

26

27

28

I, Celine G. Purcell, hereby declare and state:

1.   I am an attorney duly licensed to practice law before all the courts of the state of California, as well as admitted to practice before the United States District Court for the Northern District of California. I am an associate at The Norton Law Firm PC, and am one of the attorneys representing defendants Coinbase, Inc. and Coinbase Global, Inc. (together, "Coinbase") in the above-entitled action. Unless otherwise stated, I have personal knowledge of the matters stated herein, and if asked to testify to them, I would do so competently.

2.   Attached as **Exhibit A** is a true and correct copy of the Summons in *Aggarwal, et al. v. Coinbase, Inc., et al*., Case No. CGC23-603871, Superior Court of San Francisco, filed on January 19, 2023.

3.   Attached as **Exhibit B** is a true and correct copy of the Complaint in *Aggarwal, et al. v. Coinbase, Inc., et al*., Case No. CGC23-603871, Superior Court of San Francisco, filed on January 6, 2023.  My understanding is that Coinbase first obtained a copy of Exhibit B on January 10, 2022, though independently and not by service of process.

4.   Attached as **Exhibit C** is a true and correct copy of the Civil Case Cover Sheet in *Aggarwal, et al. v. Coinbase, Inc., et al*., Case No. CGC23-603871, Superior Court of San Francisco, filed on January 6, 2023.

5.   Attached as **Exhibit D** is a true and correct copy of the Notice to Plaintiff in *Aggarwal, et al. v. Coinbase, Inc., et al*., Case No. CGC23-603871, Superior Court of San Francisco, filed on January 6, 2023.

6.   Attached as **Exhibit E** is a true and correct copy of the electronic docket for *Aggarwal, et al. v. Coinbase, Inc., et al.*, Case No. CGC23-603871, Superior Court of San Francisco, as of shortly before the time of filing on January 25, 2023.

7.   I have reviewed the docket in *Aggarwal, et al. v. Coinbase, Inc., et al.*, Case No. CGC23-603871, Superior Court of San Francisco, as of shortly before the time of filing on January 25, 2023.  In accordance with 28 U.S.C. § 1446(a), Exhibits A-E constitute "all process, pleadings, and orders" filed in *Aggarwal, et al. v. Coinbase, Inc., et al.*, Case No. CGC23-603871, Superior Court of San Francisco.  On information and belief, neither Coinbase, Inc., nor Coinbase Global, Inc.

1   has yet been served in this action.

2       8.   Attached as **Exhibit F** is a true and correct copy of a motion for fees filed by the

3   BraunHagey & Borden LLP law firm in 2020, along with the declaration of J. Noah Hagey filed in

4   support.  These papers were filed in the Northern District of California, Case No. 16-cv-6370, in the

5   matter *Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co., LTD., et al*.  The motion and

6   declaration include information about the BraunHagey lawyers' 2020 billing rates, which ranged

7   "from $795 per hour for partners to $425 per hour for associates."  Ex. E (Dkt. No. 558-1 at ECF 3)

8   (Declaration of J. Noah Hagey in Support of Fees Motion).

9       I declare under penalty of perjury under the laws of the State of California and the United States

10  of America that the foregoing is true and correct and that I executed this declaration in San Carlos,

11  California on January 25, 2023.

12

13  _____
    Celine G. Purcell

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

<table>
<tr><td></td><td><b>FOR COURT USE ONLY</b><br><i>(SOLO PARA USO DE LA CORTE)</i></td></tr>
</table>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
COINBASE, INC. and COINBASE GLOBAL, INC.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
MANISH AGGARWAL, MOSTAFA EL BERMAWY, and AMISH SHAH, on behalf of the California public

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es:)* San Francisco County Superior Court<br><br>Civic Center Courthouse, 400 McAllister St., San Francisco, CA 94102-4514 | CASE NUMBER:<br>*(Número del Caso):*<br>**CGC-23-603871** |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es)*:
J. Noah Hagey; BraunHagey & Borden LLP; 351 California Street, 10th Floor, San Francisco, CA 94104; Telephone: (415) 599-0210

| DATE:<br>*(Fecha)* 01/19/2023 | Clerk, by<br>*(Secretario)* _____ EDNALEEN ALEGRE | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

# EXHIBIT B

1   J. Noah Hagey, Esq. (SBN: 262331)
        hagey@braunhagey.com
2   Matthew Borden, Esq. (SBN: 214323)
        borden@braunhagey.com
3   Ronald J. Fisher, Esq. (SBN: 298660)
        fisher@braunhagey.com
4   J. Tobias Rowe, Esq. (SBN: 305596)
        rowe@braunhagey.com
5   BRAUNHAGEY & BORDEN LLP
    351 California Street, 10th Floor
6   San Francisco, CA 94104
    Telephone: (415) 599-0210
7   Facsimile: (415) 276-1808

8   Jonathan Kortmansky, Esq. (*pro hac vice* forthcoming)
        kortmansky@braunhagey.com
9   Molly M. Jamison, Esq. (*pro hac vice* forthcoming)
        jamison@braunhagey.com
10  BRAUNHAGEY & BORDEN LLP
    118 W 22nd Street, 12th Floor
11  New York, NY 10011
    Telephone: (646) 829-9403
12  Facsimile: (646) 403-4089

13  *Attorneys for Plaintiffs Manish Aggarwal,*
    *Mostafa El Bermawy, and Amish Shah*
14

15
16              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

                      **COUNTY OF SAN FRANCISCO**
17

18  MANISH AGGARWAL, MOSTAFA EL            Case No. _____
    BERMAWY, and AMISH SHAH, on behalf of
19  the California public,
                                           **COMPLAINT FOR (1) VIOLATION OF**
20              Plaintiffs,                **CLRA (CAL. CIV. CODE §§ 1750, ET**
                                           **SEQ.); (2) VIOLATION OF FAL (CAL.**
21           v.                            **BUS. & PROF. CODE §§ 17500, ET SEQ.);**
                                           **(3) VIOLATION OF UCL (CAL. BUS. &**
22  COINBASE, INC. and COINBASE GLOBAL,    **PROF. CODE §§ 17200 ET SEQ.)**
    INC.,
23
                Defendants.
24

25
26
27
28

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**01/06/2023**
**Clerk of the Court**
**BY: JEFFREY FLORES**
**Deputy Clerk**

**CGC-23-603871**

Plaintiffs Manish Aggarwal, Mostafa El Bermawy, and Amish Shah, on behalf of the California public, allege as follows:

**INTRODUCTION**

1.      Plaintiffs bring this action for public injunctive relief to protect members of the general public from dangerous misrepresentations made by Defendants Coinbase, Inc. and Coinbase Global, Inc. (collectively, "Coinbase"), the country's largest cryptocurrency investment platform. Coinbase represents that its platform is secure, when in fact, it is not. Through this misrepresentation, Coinbase has deceived thousands of small investors, who would otherwise use safe and insured banking and investment platforms, into entrusting Coinbase with billions of dollars in savings. Coinbase exacts substantial fees and commissions in return. But when its security is breached, it takes the position that it has no obligation to make its users whole.

2.      Contrary to its representations that it provides "bank-level security" and industry leading security, Coinbase does a poor job of protecting its user accounts from intrusion and offers much feebler protection than the security provided by banks and other crypto businesses. Coinbase does an even worse job of working to mitigate those thefts after they occur. Instead of providing "24/7 live support," as it promises, it forces fraud victims to navigate an impenetrable automated "customer service" process that leads nowhere. Coinbase is aware of these problems and has paid large fines to regulators for security breaches and lack of fraud controls. Yet, the problems persist, and members of the public like Plaintiffs continue to put their money into Coinbase, where it is easy pickings for hackers.

3.      Plaintiffs purchased several hundred thousand dollars' worth of cryptocurrency. In reliance on Coinbase's representations about the security of its platform, Plaintiffs kept their cryptocurrency in electronic "wallets" stored on Coinbase's servers. Plaintiffs used the accounts like any other bank or investment holdings to make transactions, withdrawals, and additional investments.

4.      In April 2022, hackers gained access to Plaintiff Aggarwal's account, through no fault of his own, and, after locking him out, drained it of more than $200,000 of his family's hard-earned savings. When Mr. Aggarwal tried to alert Coinbase, it routed him through its automated

1  complaint process—a recursive loop of impenetrable screens that prevented him from explaining

2  his situation to any human being and was incapable of redressing the theft of his savings.

3        5.      In July 2022, Coinbase did the same thing to Plaintiff El Bermawy. Like Mr.

4  Aggarwal, Mr. El Bermawy found himself locked out of his account while hackers robbed it.

5  Instead of providing support, Coinbase refused to assist Mr. El Bermawy in recovering his stolen

6  cryptocurrency and instead canceled his account.

7        6.      Coinbase's continued failures caused the same thing to happen to Plaintiff Shah. In

8  August 2022, Mr. Shah found himself locked out of his Coinbase account and, despite multiple

9  calls to Coinbase support, Coinbase did not help him. In early September 2022, hackers gained

10  access to his Coinbase account and stole over $14,000 worth of cryptocurrency and United States

11  dollars that Mr. Shah was storing with Coinbase. The hackers were able to circumvent the two-

12  factor authentication requirement to access Mr. Shah's account. Mr. Shah repeatedly reached out to

13  Coinbase to attempt to investigate the breach, but Coinbase responded to his inquiries with

14  automated bounce-back responses, requests to repeat the same verification steps over and over

15  again, and suggestions to simply delete his account (which would wipe the transaction history and

16  make it even harder to determine the nature and origin of the hack).

17        7.      Accordingly, Plaintiffs bring this action seeking injunctive relief on behalf of the

18  general public to prevent Coinbase from continuing to misrepresent the nature of its platform and

19  procedures to investigate and ameliorate security issues.

20                            **JURISDICTION AND VENUE**

21        8.      The Court has jurisdiction over Defendants pursuant to Code of Civil Procedure

22  § 410.10 because Coinbase intentionally availed itself of the laws and markets of California by

23  advertising, soliciting customers, offering its services, conducting its business, and entering

24  contracts in California.

25        9.      Venue is proper in San Francisco County pursuant to Code of Civil Procedure

26  § 395.5 because Coinbase's principal place of business is in San Francisco County.

27

28

# THE PARTIES

10.     Plaintiff Manish Aggarwal is a Coinbase customer. He is a citizen of the State of Connecticut.

11.     Plaintiff Mostafa El Bermawy is a Coinbase customer. He is a citizen of the State of New York.

12.     Plaintiff Amish Shah is a Coinbase customer. He is a citizen of the State of Illinois.

13.     Defendant Coinbase, Inc., is a publicly-traded Delaware corporation with its headquarters and principal place of business in San Francisco, California. Defendant Coinbase, Inc. is registered with the Secretary of State of California and has an agent for services of process in California. Coinbase is the largest cryptocurrency exchange in the United States by trading volume and claims to have more than 108 million verified users. Defendant Coinbase, Inc. is a wholly owned subsidiary of Defendant Coinbase Global, Inc.

14.     Defendant Coinbase Global, Inc. is a Delaware corporation with its headquarters and principal place of business in San Francisco, California. Coinbase Global, Inc. is the parent company of Coinbase, Inc.

15.     Coinbase is the largest cryptocurrency institution in the U.S., and its role in the American financial system is growing in importance. In the last fifteen years, cryptocurrency has grown from a high-tech novelty to a major asset class into which ordinary American consumers and other investors have poured hundreds of billions of dollars.

16.     Coinbase has made billions of dollars by positioning itself as a trusted repository of consumers' funds and the "most secure" platform for buying, selling, and storing cryptocurrency. Coinbase positions itself as a market-leader in security by making statements such as "we're the only crypto exchange to have never been hacked." Coinbase's website touts its "best-in-class" security practices.

17.     Coinbase is the most prominent cryptocurrency repository and trading platform for ordinary consumers across the country. Like any bank or other financial institution holding billions of dollars of consumers' funds, Coinbase holds itself out as a secure place to store fungible instruments such as currencies and other asserts and represents to the public that "we are required

1    to safeguard customers' assets using bank-level security standards applicable to our wallet and

2    storage systems."[1] Coinbase cannot walk-back those assertions through buried disclaimer language

3    on its website. Coinbase should be enjoined from telling potential customers that it offers a secure

4    platform akin to a bank where consumers can keep their savings.

5                                                **FACTS**

6        **A.    The Rise of Cryptocurrencies**

7        18.    Cryptocurrencies are digital assets that use decentralized computer networks, rather

8    than a nation's central bank or other issuing authority, to uphold them.

9        19.    Unlike traditional currency, cryptocurrencies rely on a digital ledger, which is a

10   publicly available database listing the complete ownership and transaction history of every "coin."

11   The ledger is protected by strong cryptography, meaning that it would be impossible for a

12   malicious actor to alter ownership information in the database using presently available technology.

13   The secure ledger, combined with the limited supply of available coins, allows cryptocurrencies to

14   function as a fungible medium of exchange with which owners can purchase other assets

15   (including, frequently, other cryptocurrencies).

16       20.    Cryptocurrencies were first theorized beginning in the 1980s, but were not adopted

17   widely until the last fifteen years. The most popular cryptocurrency today, Bitcoin, was launched in

18   2009.

19       21.    In a short period of time, cryptocurrencies have gone from a novelty asset owned by

20   a few tech-savvy early adopters to a major asset class—and have displaced conventional currency

21   in many transactions.

22       22.    In 2010, in the first reported commercial transaction using Bitcoin, a buyer

23   reportedly purchased two Papa John's pizzas for 10,000 Bitcoin. By May 2021, just eleven years

24   later, the value of that 10,000 Bitcoin would have been more than $600 million (or approximately

25   30 million large cheese pizzas). Each Bitcoin is now worth tens of thousands of dollars, peaking at

26

27   _____

     [1] Coinbase Global, Inc. Quarterly Report (Form 10-Q) at 94, SEC (Aug. 9, 2022),
28   https://www.sec.gov/ix?doc=/Archives/edgar/data/1679788/000167978822000085/coin-
     20220630.htm.

                                                    4

over $60,000 in 2021. The total market capitalization of Bitcoin alone is hundreds of billions of dollars. And the total market capitalization of all cryptocurrencies has been estimated at more than $2 trillion as recently as March 2022.

23.     The astronomical growth of cryptocurrency as an asset class has been fueled in large part by ordinary American consumers. Cryptocurrency has gained popularity well beyond the early circles of technologically—and financially—sophisticated investors. Mainstream transactions for property, payment of wages and salary, and purchases of goods and services are now regularly conducted in cryptocurrencies instead of government-backed "fiat currencies" like the United States Dollar. Today, encouraged by platforms like Coinbase, ordinary consumers store and invest their savings and retirement plans in cryptocurrency. Some of these consumers convert their traditional assets to cryptocurrencies to facilitate other investment opportunities. Millions of other consumers convert their traditional savings into cryptocurrencies for the purpose of holding and storing that cryptocurrency in the hopes its value appreciates.

**B.      The Role of Coinbase**

24.     To hold or trade in cryptocurrencies, consumers rely on a new breed of financial institutions that act both as banks to hold their assets in a secure location and market-maker to facilitate the buying and selling of cryptocurrencies among the general public.

25.     The most prominent and successful of these institutions is Coinbase. Combining the features of a bank, brokerage, and stock exchange, Coinbase acts as a custodian for customers' funds, allows customers to trade cryptocurrencies, and operates an exchange where trading occurs.

26.     Coinbase was founded in 2012 and has quickly grown into the largest and most profitable institution in the world of cryptocurrency. At its initial public offering in 2021, Coinbase's estimated value was reportedly $47 billion. Today, Coinbase claims to have over 108 million customers and handles customer trades totaling $159 billion on a quarterly basis.

27.     Coinbase's business model depends on persuading ordinary consumers to begin trading cryptocurrency. Coinbase's annual report for 2021 touts its "simple onboarding process that allows retail users to sign up and quickly purchase their first crypto asset" and claims that Coinbase is "a primary on-ramp for customers' journeys into the cryptoeconomy."

28.     As part of these efforts, Coinbase also encourages people to invest their retirement savings in cryptocurrency through web advertisements like "The Crypto Guide to Retirement Savings"[2] and through its partnership with 401(k) plan provider ForUsAll.

**C.     Coinbase Advertises its Platform as Secure**

29.     Because it understands that public faith in the security of its platform is critical to the success of its business, Coinbase subjects consumers to a barrage of representations on its website stating that its cryptocurrency storage is secure: that it has "industry-leading security," uses "Payment Industry Best Practices," is the "most trusted crypto exchange," uses "state-of-the-art encryption," that "your assets are protected," that "your bitcoin is as safe as possible," and that it offers "multifaceted risk management programs designed to protect customers' assets."



SECURITY

# The most trusted crypto exchange

108+ million users trust us, and so can you.

**Sign up now**

### Industry-leading security

Additional security options on all of your devices provide more ways to keep your crypto safe and secure.

---

[2] *The Crypto Guide to Retirement Savings*, Coinbase, https://www.coinbase.com/learn/crypto-basics/retirement (last visited Jan. 6, 2023).

1
2
3
4
5
6



https://www.coinbase.com/security (captured Jan. 28, 2022)

7
8
9
10
11
12
13
14
15
16
17

### Your assets are protected

Your crypto is your crypto. It's that simple. Coinbase doesn't use, or lend, your assets without your permission. Also, we offer the most secure and multifaceted risk management programs designed to protect our customers' assets.

Learn more →

https://www.coinbase.com/security (captured Oct. 6, 2022)

18
19
20
21
22
23
24
25
26
27

# SECURITY FOR YOUR PEACE OF MIND

We take careful measures to ensure that your bitcoin is as safe as possible.

https://www.coinbase.com/security (captured Jan. 28, 2022)

28

# The proof is in our platform.

Here's why you can trust us:



## We're the largest public crypto company in the world

In April 2021, Coinbase became the largest publicly traded crypto company in the world. That means we operate with more financial transparency, and make our financial statements available each quarter.

Learn more →

https://www.coinbase.com/security (captured Oct. 6, 2022)



## We use state-of-the-art encryption and security

The technology that powers our platform was developed with industry-leading security and encryption at its core. Our security team is constantly working to make sure you and your assets are protected from emerging threats.

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Most trusted. Most secure.

Learn why 89M+ people around the world trust us as their entry point into the cryptoeconomy.

https://www.coinbase.com/security (captured July 6, 2022)



# We offer the finest tools to protect your account

From auto-enrolled 2 factor-authentication (with security key support), password protection, to multi-approval withdrawals in Coinbase Vault, we provide powerful security features to all our users.

30.     This advertising and the user interface Coinbase employs is designed to lure consumers to deposit their hard-earned funds with Coinbase. Throughout its advertising and sign-up process Coinbase represents that it employs extensive security measures to get users to create accounts and start depositing funds and trading and storing cryptocurrency with Coinbase.

31.     As soon as individuals click on the "Sign Up" button to create a Coinbase account, they are presented with representations touting the platform's security.

An individual account is the best way to manage your personal crypto portfolio.

〜  **Access to hundreds of cryptocurrencies**
Buy, sell, and track your crypto all in the one place.

□  **Safe & secure**
Industry best practices are used to keep your crypto safe.

32.     Coinbase's user interface constantly reassures new customers regarding the safety and security of the platform, and consumers rely on these representations when they invest and store their hard-earned savings with Coinbase. Consumers believe that these funds are safe with Coinbase.

33.     Coinbase separately represents that each aspect of its services is secure:

**C WALLET**

# Coinbase Wallet

Your key to the world of crypto

- Store all of your crypto and NFTs in one place
- Support for hundreds of thousands of tokens and a whole world of dapps
- Explore the decentralized web on your phone or browser
- Protect your digital assets with industry-leading security

**Download Coinbase Wallet**

# About Coinbase

We are building the cryptoeconomy – a more fair, accessible, efficient, and transparent financial system enabled by crypto.

We started in 2012 with the radical idea that anyone, anywhere, should be able to easily and securely send and receive Bitcoin. Today, we offer a trusted and easy-to-use platform for accessing the broader cryptoeconomy.

COMPLAINT

1
2
3
4
5
6
7
8
9
10

 

11      34.     Indeed, the front page of Coinbase's website explains that the purpose of the
12   platform is to provide a place to "securely buy, sell, and manage hundreds of cryptocurrencies":
13



14
15
16
17
18
19
20

21      35.     Coinbase's representations are not limited to its own website. Coinbase's search
22   engine marketing similarly represents that Coinbase is a secure location to store cryptocurrency.
23   Below is Coinbase's search engine listing on Google:
24
25
26
27
28

36. Similarly, Coinbase's social media advertising claims that Coinbase is the "safest and most secure crypto experience" on the market.



37. Coinbase also represented to consumers that it has "never been hacked" and that it maintained insurance to protect their digital holdings.



How is my crypto stored?

Thanks to our best-in-class security practices, we're the only crypto exchange to have never been hacked. We strategically store over 98% of deposits offline in secure cold storage facilities that are guarded and monitored 24/7. We also maintain an extensive insurance policy to protect assets held online.

https://www.coinbase.com/security (captured July 6, 2022).

38.     In response to public criticism that Coinbase does not sufficiently secure its customers' assets, Coinbase's Chief Legal Officer, Paul Grewal, issued a public statement on Twitter: "We have always protected our customer funds both legally and physically."



**D.     Coinbase Tells Investors That It Employs Bank-Level Security**

39.     In addition to its advertising, Coinbase publicly represents to investors that it provides bank-level security. In a recent quarterly SEC disclosure statement, Coinbase represented that "we are required to safeguard customers' assets using bank-level security standards applicable to our wallet and storage systems, as well as our financial management systems related to such custodial functions."[3]

_____

[3] Coinbase Global, Inc. Quarterly Report (Form 10-Q) at 94, SEC (Aug. 9, 2022), https://www.sec.gov/ix?doc=/Archives/edgar/data/1679788/000167978822000085/coin-20220630.htm.

13

COMPLAINT

40.     In responding to the criticism referenced above, Mr. Grewal recently also provided a link to a statement published on Coinbase's website that likens Coinbase's systems to a bank:

> • **Your funds are your funds, and your crypto is your crypto**: Coinbase maintains internal systems, like a bank or a broker. Our fully audited ledger identifies your account, your fiat and crypto holdings, and tracks your account activity in real time. There's never a situation where customer funds could be confused with corporate assets.

**E.     Coinbase Advertises Account Protections and Customer Service**

41.     Coinbase represents that it proactively protects consumers' accounts and take measures to prevent theft.

42.     For example, Coinbase represents that it proactively monitors for data breaches and threats and will "automatically secure your login credentials if it looks like your account may be at risk."

> **Enhanced Account Protections**                              −
>
> We monitor third-party data breaches and darknet markets for threat indicators, and automatically secure your login credentials if it looks like your account may be at risk.
> Learn more

43.     Coinbase claims that it provides "Proactive Security Notifications" that would allow consumers to lock their accounts in the event of a hack.

> **Proactive Security Notifications**                          −
>
> For all main security changes in your account settings, we will communicate with you and even give you the option of locking your account.

44.     Coinbase advertises that if there are suspicious transactions, "we'll give you the option to cancel a transaction before it's submitted to the blockchain."

1
2
3
4
5

> **Behind the Scenes** —
>
> Our machine learning models evaluate your crypto transactions, and we'll give you the option to cancel a transaction before it's submitted to the blockchain if things don't look right.

6
7
8
9

45.    And while Coinbase encourages all customers to follow "good security practices," the company acknowledges that "[s]ince most people are not specifically trained in computer security, Coinbase can manage the bulk of these security measures on your behalf."

10
11
12
13

> As a holder of bitcoin, you have tremendous power over your money. Because of this, it is important to follow good security practices to protect your funds. Since most people are not specifically trained in computer security, Coinbase can manage the bulk of these security measures on your behalf.

14
15
16

46.    Coinbase also claims that it offers "24/7 live support" for consumers who may have had their accounts compromised.

17
18
19
20
21
22



23
24

**F.    Plaintiffs Relied on Coinbase's Representations**

25
26
27

47.    Mr. Aggarwal read Coinbase's representations about Coinbase's security measures on Coinbase's website and in its marketing materials and relied on those representations in purchasing and storing cryptocurrency with Coinbase.

28

48.     Likewise, Mr. El Bermawy read the representations regarding Coinbase's security measures on Coinbase's website and in its marketing materials and relied on those representations in purchasing and storing cryptocurrency with Coinbase.

49.     Mr. Shah also read Coinbase's representations and relied on those representations in purchasing and storing cryptocurrency with Coinbase.

50.     Based on Coinbase's representations, Mr. Aggarwal, Mr. El Bermawy and Mr. Shah believed that their funds would be safe with Coinbase, that Coinbase would be able to help prevent their funds from being stolen, and that Coinbase would help protect them in the event their accounts were compromised.

**G.     Coinbase's Representations About Security Are Designed to Induce Members of the Public to Use Coinbase to Store Their Funds**

51.     Security is an important—if not the most important—consideration for members of the public who are interesting in trading and storing cryptocurrency. Many prospective customers are looking for a platform that will keep their digital assets as safe as a traditional bank keeps conventional currency. Consumers choose which cryptocurrency platforms to use based in large part on the platforms' representations about security.

52.     Coinbase knows that its communications to the public about the security of its services are extremely important to consumers. On May 10, 2022, during a quarterly earnings call, Coinbase co-founder and CEO Brian Armstrong explained that the reason Coinbase makes representations about its security features is to create a "competitive moat" that Coinbase uses to create a business advantage over competitors in the cryptocurrency industry.[4] Mr. Armstrong went on to state:

> It comes down to cybersecurity – we're storing more crypto securely for our customers. And so whenever people are coming into a new industry, they generally want to go with the one that it's been around the longest, it's trusted by the most people, it has the most number of users. Coinbase is really the only crypto company that's public in this environment. And we're storing such a large amount of crypto that I

---

[4] First Quarter 2022 Earnings Call, Coinbase (May 10, 2022), https://s27.q4cdn.com/397450999/files/doc_financials/2022/q1/Coinbase-Q1'22-Earnings-Call-Transcript.pdf.

think that's a defensible moat ***because basically when people trust us, they store crypto with us***.

(*Id.* (emphasis added).)

53.     Recent turbulence in the cryptocurrency markets—including the high-profile collapses of cryptocurrency firms Three Arrows Capital and FTX, resulting in *trillions* of dollars lost and government investigations into those firms and others, like Kraken and the now-bankrupt Celsius platform—has made consumers especially concerned about the safety of their cryptocurrency holdings.

54.     While the cryptocurrency market has been roiled by recent news, Coinbase has continued to represent its platform as the "most trusted" and "most secure" cryptocurrency platform. As Coinbase itself acknowledges, both in filings to the SEC as well as statements made to its investors, these representations regarding security are material to consumers and essential for Coinbase to maintain a competitive edge in the cryptocurrency industry. Gaining the trust of consumers by marketing its platform as the "most secure" is a critical element of Coinbase's brand and competitive strategy.

55.     For example, in December 2022, weeks after the collapse of FTX, Coinbase ran a full-page ad in the Wall Street Journal stating that "millions of people put their money—and trust—with people that didn't deserve it." To contrast itself with others in "the crypto space" not deserving of consumer trust, Coinbase proclaimed "Trust Us" in extra-large letters. It further stated that "Coinbase has sought to be the most secure and compliant crypto exchange."[5]

---

[5] Stephen Graves, *The Crypto Ads That Made Waves in 2022,* Yahoo News (Dec. 27, 2022), https://news.yahoo.com/crypto-ads-made-waves-2022-214755826.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS88&guce_referrer_sig=AQAAAIom9GCnXtyqdIDTZu5RO98lMgyoqm8FlnMF2QofKIiysTYpQ6FLbRPXHPKKTteOMUe3ueXoeDIVooNJjaLtCD1iJC9SIcMxNYmUozDtR9pZ0N_z4mACxndtzHVVotTTXrDvFzaV1bkfIp_qEByToeIFWUT-roo9EIIO6YnE88aX.



56.     Also in December 2022, Coinbase ran an online and television ad featuring soundbites of pundits expressing skepticism about "the world of crypto."[6] The ad states that "There's a lot of noise right now" and "A lot of talk," but reassures consumers that Coinbase is "The Most Trusted Crypto Exchange." The minute-long ad was aired during the primetime college football playoff game on December 31, 2022—a top-20 cable telecast of all time peaking at nearly 24 million viewers.

57.     Coinbase spends money placing its ads touting its trustworthiness and security in premier advertising slots because it knows that such representations are likely to induce consumers into using Coinbase over competitor cryptocurrency firms.

---

[6] Coinbase, *Ignore the noise. Keep building.*, YouTube (December 13, 2022), https://www.youtube.com/watch?v=wv1XpQctN1w

**H.      The 2021 Coinbase Security Failure**

58.      Coinbase's representations regarding the security of its platform have proven untrue. Despite claims that it was "the only crypto exchange to have never been hacked," Coinbase has been hacked and had customer funds stolen in multiple instances within the last two years.

59.      Between March and May 20, 2021, attackers gained access to Coinbase customer accounts and stole customers' funds by transferring them off the Coinbase platform. The breach affected more than 6,000 consumers.

60.      Coinbase acknowledged the 2021 security failure in a filing with the California Attorney General made pursuant to California's data breach statute, Civ. Code § 1798.82(a).7.

61.      Prior to Coinbase's 2021 security failure, Coinbase used a two-factor identification security protocol using SMS (text messages). Users would access the Coinbase app or website and would be asked to create a password meeting certain requirements. During this process, Coinbase would require the user to provide a cellphone number. Coinbase would text a one-time authentication code that the user would have to input to create the password for their Coinbase account. Once the user input the code texted by Coinbase, Coinbase would then recognize the device and user's password as secure. The same process applied for changing passwords: the user would have to input their old password and a new one-time authentication code texted by Coinbase. By Coinbase's own admission, the attackers in the 2021 hack "took advantage of a flaw in Coinbase's SMS Account Recovery process."

62.      Coinbase acknowledged it was aware that a security vulnerability in its platform allowed hackers to access its customers full name, email address, home address, date of birth, IP addresses for account activity, transaction history, account holdings, and account balance.

63.      Coinbase further admitted that it was aware that a security vulnerability in its platform allowed hackers to access its customers' accounts and change the email, phone number, or any other information associated with their accounts.

64.      Following the security breach, Coinbase claimed that it had "updated our SMS Account Recovery protocols to prevent any further bypassing of that authentication process."

---

[7] Coinbase Sample of Notice, California Department of Justice (March 17, 2021), https://oag.ca.gov/system/files/09-24-2021%20Customer%20Notification.pdf.

65.     Coinbase also announced that it had refunded customers for the cryptocurrency they had lost from their accounts as a result of the 2021 hack.

**I.     The 2023 New York Consent Order**

66.     Further security lapses at Coinbase came to light since the 2021 hacking incident. On January 4, 2023, Coinbase entered into a Consent Order with the New York State Department of Financial Services, in which Coinbase agreed to pay $100 million for its failures to detect, prevent, and report illegal activity on its platform, including fraudulent transfers.[8]

67.     The Department found that Coinbase failed to maintain adequate systems to monitor its customers' accounts for suspicious activity and prevent abuse, in violation of state and federal law.

68.     Among other violations, the Department found that Coinbase's "Know-Your-Customer/Customer Due Diligence" programs were "inadequate" and that "the risks to the financial system due to this weakness are not merely theoretical, but have already resulted in suspicious or unlawful conduct being facilitated through Coinbase's platform." (Consent Order ¶¶ 37-42.)

69.     Examples of the unlawful conduct enabled by Coinbase's inadequate controls included fraudulent transfers to and from Coinbase accounts. For example, in the spring of 2021, a user was able to create a fraudulent account on behalf of a third-party victim and "raise the daily withdrawal limit by 50 times, which was granted despite a total lack of activity and, therefore, no evidence that the existing thresholds were insufficient for the customer's activity." Then, on a single day, the user transferred more than $150 million from the victim's bank account to Coinbase and then transferred these funds off the platform. (*Id*. ¶ 44.)

70.     The Department also found that Coinbase failed to implement an appropriate "transaction monitoring system." Such systems are used to "monitor customers' transactions and to track, timely investigate, and appropriately address, any suspicious activity occurring on the institution's platform." (*Id*. ¶ 45.)

---

[8] Consent Order, New York State Department of Financial Services (Jan. 4, 2023), https://www.dfs.ny.gov/system/files/documents/2023/01/ea20230104_coinbase.pdf

71.     Despite its obligation to employ appropriate transaction monitoring, Coinbase failed to invest in these systems at the same pace as it rapidly signed up new customers and accepted their money. As the Department found, "by late 2021, Coinbase's failure to keep pace with its alerts resulted in a significant and growing backlog of over 100,000 unreviewed transaction monitoring alerts." (*Id*. ¶ 47.)

72.     The Department also found that Coinbase has long been aware of the inadequacy of its internal controls: "certain of these issues have been known to Coinbase since at least 2018, flagged through both internal assessments and external reviews, including examinations conducted by the Department. Although Coinbase has worked to correct these issues, its progress has been slow: progress in certain areas did not occur until recently, and work remains outstanding to the present." (*Id*. ¶ 36.)

73.     Coinbase's violations of law also included failing to report the 2021 hacking incident to New York authorities for five months after the event occurred. (*Id*. ¶ 67.)

74.     As a result of these violations, the Department concluded that "Coinbase conducted business in an unsafe and unsound manner, in violation of New York Banking Law § 44" and committed other violations of law. (*Id*. ¶¶ 69-72.)

75.     After the New York settlement was announced, Coinbase issued a statement on Twitter and its website characterizing the New York Settlement as "focused on historical shortcomings in Coinbase's compliance program" and asserting that Coinbase nonetheless aspires to be "the most trusted, compliant, and secure crypto exchange in the world."[9]

76.     The statement's characterization of the New York settlement as focused on "historical issues" is false and misleading because the Consent Order concerns ongoing violations, states that Coinbase has not yet fully complied with all legal requirements, and requires the appointment of an independent monitor to verify Coinbase's compliance.

---

[9] Paul Grewal, *Coinbase and NYDFS reach agreement to resolve compliance investigation*, Coinbase (Jan. 4, 2023), https://www.coinbase.com/blog/Coinbase-and-NYDFS-reach-agreement-to-resolve-compliance-investigation.

**J.     Coinbase Failed to Securely Store Plaintiffs' Funds**

77.     Whatever security updates Coinbase may have made following the 2021 security failure or during the New York Department of Financial Services investigation have been insufficient to prevent customers from continuing to have funds stolen by hackers in the time since.

78.     One measure Coinbase took was to encourage customers to use an outsourced security program called Google Authenticator. Unlike text message-based authentication, Google Authenticator relies on a software application installed on a user's smartphone to deliver the authentication code, bypassing vulnerabilities in text message technology. This measure did not render Coinbase's platform secure because it is Coinbase's own security that is lacking.

79.     Before using Coinbase, Mr. Aggarwal visited the website and read and relied on Coinbase's representations about its security. Like all users of Coinbase, Mr. Aggarwal had to go to the Coinbase website because it provided him the instructions needed to set up his account. He followed those instructions and relied on Coinbase's representations regarding the security of its systems. Mr. Aggarwal is one of the Coinbase customers who implemented Google Authenticator at Coinbase's urging.

80.     Before using Coinbase, Mr. El Bermawy also visited the website and read and relied on Coinbase's representations about its security. Like all users of Coinbase, Mr. El Bermawy had to go to the Coinbase website because it provided him the instructions needed to set up his account. He followed those instructions and relied on Coinbase's representations regarding the security of its systems. Mr. El Bermawy implemented two-factor authentication on his Coinbase account using SMS-based authentication.

81.     Before using Coinbase, Mr. Shah also visited the website and read and relied on Coinbase's representations about its security. Like all users of Coinbase, Mr. Shah had to go to the Coinbase website because it provided him the instructions needed to set up his account. He followed those instructions and relied on Coinbase's representations regarding the security of its systems. Mr. Shah implemented two-factor authentication on his Coinbase account using SMS-based authentication. Following Coinbase's representations that it was a secure place to store funds

1  for safekeeping, Mr. Shah used Coinbase for such purposes. Based on Coinbase's representations,

2  Mr. Shah expected his funds to be safeguarded like at a bank while he stored them with Coinbase.

3      82.    Hackers nevertheless bypassed Coinbase's security and drained Mr. Aggarwal, Mr.

4  El Bermawy, and Mr. Shah's accounts.

5      83.    Between February 2021 and April 2022, Mr. Aggarwal accumulated Bitcoin totaling

6  approximately $200,000 in value, which he stored in his Coinbase wallet.

7      84.    On April 20, 2022, Mr. Aggarwal began having trouble logging into his account. He

8  attempted to reset his password through Coinbase's password reset system to no avail. Relying on

9  Coinbase's representations that its platform was secure, he believed the issue would be resolved

10  soon.

11      85.    On April 24, 2022, Mr. Aggarwal received a call purporting to be from Coinbase

12  acknowledging his difficulty accessing his account and suggesting that he try resetting his

13  password. Later that day, Mr. Aggarwal again attempted to reset his password using Coinbase's

14  system, but was unsuccessful.

15      86.    On that day, April 24, 2022, all of Mr. Aggarwal's cryptocurrency was rapidly

16  transferred to an external account. Within a span of just 49 minutes, Mr. Aggarwal's account was

17  drained, without his authorization, through more than 6,000 small transfers of cryptocurrency

18  totaling approximately $190,000 in value.

19      87.    Unaware that his account had been emptied, Mr. Aggarwal tried in vain for days to

20  regain access to his account. On April 25 and 26, 2022, Mr. Aggarwal called a Coinbase support

21  line. The system refused to connect him with a human being; instead, he received a recorded

22  message stating that his phone number was not associated with his account. That was inaccurate

23  because Mr. Aggarwal was using the same telephone number he had registered with his account. It

24  was also contrary to Coinbase's representations on its website that users would be able to get help

25  by phone from Coinbase's team:

26

27

28

1
2
3
4
5
6
7
8
9
10



## Get the help you need, when you need it

You can always contact our support team by phone or messaging to speak with our virtual assistant, or depending on the hours, with a real live support agent. You can also check out our Help Center for quick solutions to common problems.

11
12

88.    On April 27, 2022, Mr. Aggarwal attempted to reach Coinbase through its online

13

support link. He again could not speak with a human being; instead, he received an email stating

14

that his email address was not associated with his Coinbase account. That was inaccurate because

15

Mr. Aggarwal was using the same email address with which he had registered his account.

16

89.    Finally, Mr. Aggarwal was able to make contact with individuals at Coinbase. On

17

April 28, 2022, Coinbase finally put a hold on Mr. Aggarwal's account while it investigated the

18

issue. By that time, it was too late to stop the fraudulent transfers.

19

90.    After several frustrating days of being told that he did not have an account with

20

Coinbase, Coinbase finally informed Mr. Aggarwal that his account had been emptied. Coinbase

21

also admitted to Mr. Aggarwal that whoever accessed the account had obtained the correct Google

22

Authenticator code to log into the account. This detail is important because Mr. Aggarwal logged

23

into Coinbase through his phone, and his phone never left his control during the attack.

24

91.    Mr. Aggarwal is not aware of any viruses, worms, or other malware such that the

25

security breach occurred on his end.

26

92.    Upon information and belief, Mr. Aggarwal was not victim to any third-party

27

phishing attack or sim swap attack whereby hackers obtained his Coinbase login information or

28

Google Authenticator security key independent of Coinbase.

93.     In light of these facts, the only explanation for how Mr. Aggarwal's account was emptied is that a third party—either a hacker or Coinbase employee—was able to see his two-factor authentication code on Coinbase's system because Coinbase did not take sufficient care to prevent access to that information.

94.     Coinbase refused to repay Mr. Aggarwal. Nor did it remedy its internal security problems that led to Mr. Aggarwal's losses.

95.     Mr. Aggarwal remains interested in purchasing, trading, and storing cryptocurrencies, hopes to continue such activities in the future, and would continue using Coinbase's services should it resolve the issues identified in this pleading.

96.     On or around July 21, 2022, Mr. El Bermawy fell victim to a hack that was similar to the one suffered by Mr. Aggarwal. Mr. El Bermawy secured his Coinbase account through the use of SMS-based two-factor authentication, but hackers were nevertheless able to access his account.

97.     Early in the morning of July 21, 2022, Mr. El Bermawy was alerted to someone having changed his Coinbase account password. Concerned by this activity, Mr. El Bermawy attempted to sign in to his Coinbase account but found he was unable to sign in. He attempted to sign in multiple times from both his phone and his computer to no avail.

98.     Hours after the hack, Mr. El Bermawy was finally able to access his account after verifying his identification with Coinbase. At this point, Mr. El Bermawy discovered that the hackers had stolen approximately $70,000 worth of cryptocurrency and United States Dollars, leaving only $0.19 in his account.

99.     Mr. El Bermawy immediately contacted Coinbase customer support. After several hours without any response, Coinbase informed Mr. El Bermawy that their security team "found a set of login credentials published on the web that look like they match [Mr. El Bermawy's] Coinbase account credentials."

100.    Instead of offering Mr. El Bermawy assistance in recovering his stolen funds or otherwise making him whole for his loss, Coinbase customer support informed Mr. El Bermawy

that Coinbase could "no longer support [his] account" and that "for security reasons" they were "unable to elaborate on [their] internal decision process."

101.    After the hack, Mr. El Bermawy was able to access his account, but Coinbase had implemented a restriction that allowed Mr. El Bermawy only to withdraw his remaining funds.

102.    Even though Mr. El Bermawy had implemented the security measures Coinbase recommended, Coinbase's response to Mr. El Bermawy being hacked was to kick him off their platform without any real explanation and instead offer only the meaningless remedy of allowing him to withdraw the remaining $0.19 left in his account.

103.    Since the hack, Coinbase has sent Mr. El Bermawy over 100 emails purportedly confirming that Mr. El Bermawy's photo ID has been verified despite Mr. El Bermawy taking no action to access his account or to verify his ID with Coinbase.

104.    Mr. El Bermawy remains interested in purchasing, trading, and storing cryptocurrencies, hopes to continue such activities in the future, and would continue using Coinbase's services should it resolve the issues identified in this pleading.

105.    Mr. Shah's Coinbase account was hacked—and his funds stolen—in a similar manner. Starting in May 2022, Mr. Shah started to have trouble access his account and found he had been locked out of his Coinbase account. He contacted Coinbase support multiple times in an attempt to unlock his account, but he remained unable to access his account.

106.    On September 4, 2022, Mr. Shah's account was somehow accessed from an unauthorized device.

107.    Despite Mr. Shah having implemented two-factor SMS authorization, the hacker was able to access his account without Mr. Shah providing his authorization code.

108.    After bypassing Coinbase's security measures, the hacker appears to have modified the two-factor authorization method on Mr. Shah's account changing it from an SMS authorization that would send a text to Mr. Shah's phone to an authenticator method that Mr. Shah did not have access to.

109.    The hacker was also able to connect Mr. Shah's Coinbase's account to a new debit card that was not affiliated with any bank Mr. Shah had previously connected to his account.

110.     The hacker then sold $7,067.50 worth of Mr. Shah's cryptocurrency converting it into United States Dollars. The hacker then immediately transferred the entire balance of Mr. Shah's account—$14,294.89—to this unknown debit card, leaving Mr. Shah with nothing in his account.

111.     At no point did Coinbase alert Mr. Shah of the change to his two-factor authentication, the linking of a new debit card to his account, or the transfer of all his funds.

112.     Mr. Shah contacted Coinbase support once he realized he had been hacked. Following the attack, Coinbase locked Mr. Shah's account (although Mr. Shah had been effectively locked out of his own account since the hackers took it over) and sent him five or more duplicative emails describing steps he could take to verify and restore access to his account.

113.     Over the following two weeks, Mr. Shah exchanged dozens of emails and calls with Coinbase in attempts to recover his account and investigate the hack.

114.     Several of Mr. Shah's emails were met with either automated bounce-back notices or instructions from Coinbase to complete steps that Mr. Shah had already completed, such as provide a photo of him holding his driver's license.

115.     Mr. Shah provided Coinbase with all the information he had about the hack, including the relevant transaction history. Believing that one vulnerability in Coinbase's security is the two-factor authentication system on his mobile device, Mr. Shah asked Coinbase how to reset his two-factor authentication protocol. In response, Coinbase sent him duplicative emails with instructions that were non-functional because the referenced prompts and web pages did not exist. When Mr. Shah told Coinbase that its instructions were useless, Coinbase continued to provide only the same instructions over and over again.

116.     At one point, Coinbase instructed Mr. Shah to make a new account and delete the old account, and advised him that doing so would not preserve his transaction history necessary to investigate the hack.

117.     Mr. Shah did not regain access to his account until September 19, 2022. But at that point it was too late—Mr. Shah's money was long gone. Shortly after recovering access, Coinbase once again locked Mr. Shah out of his account.

118.    Coinbase has not repaid Mr. Shah and has not provided Mr. Shah with the information he needs to understand how his account was compromised.

119.    As a result of his Coinbase account being comprised, Mr. Shah has had to change his passwords for multiple platforms, including banking and other financial accounts, and he had to contact his bank to ensure his account was secure. While he has taken measures to try to make sure his accounts are safe, he does not know if the hackers will be able to use the personal information they gained through Coinbase to try to access other accounts in the future.

120.    Shortly after his Coinbase account was hacked, someone tried to access Mr. Shah's Venmo account using the same credentials. Unlike Coinbase, however, Venmo called Mr. Shah to alert him to the attempted unauthorized transfer and he was able to prevent the transfer from going through.

121.    Mr. Shah remains interested in purchasing, trading, and storing cryptocurrencies, hopes to continue such activities in the future, and would continue using Coinbase's services should it resolve the issues identified in this pleading.

122.    Despite Coinbase's representations that it offers proactive security protections, hackers were able to access and empty Plaintiffs' accounts without any intervention from Coinbase.

123.    At no point did Mr. Aggarwal receive a proactive security notification alerting him to the change in his login credentials. As a result, Mr. Aggarwal had no notice that hackers were actively draining his account.

124.    Mr. El Bermawy did receive notice that his account password had been changed, but once he received the notice it was already too late to prevent his account from being emptied.

125.    Mr. Shah did not receive any proactive security notification alerting him to an unauthorized debit card being added to his account. Hackers were able to transfer the balance of Mr. Shah's account to this card as a result.

126.    Despite the suspicious account activity, at no point did Coinbase "automatically secure [Plaintiffs'] login credentials" or "give [Plaintiffs'] the option to cancel a transaction . . . if things don't look right."

127.     For all three Plaintiffs, Coinbase's promised "24/7 live support" offered too little, too late. None of the three Plaintiffs could get in touch with a live agent in time to prevent a loss.

**K.      Coinbase Refuses to Make Plaintiffs Whole**

128.     Coinbase has refused to restore the value of Plaintiffs' accounts, unlike its restoration of funds to users following the 2021 security failure.

129.     As a result of Plaintiffs' experience, it is clear that security issues continue to plague Coinbase's security procedures and that customers remain vulnerable to theft of their savings.

130.     It is also clear, both from Plaintiffs' experience and from the 2021 security failure, that Coinbase's marketing claim that it is a "secure" platform is false and misleading. Coinbase knew that its various claims about being a "secure" platform were false and misleading but made those statements to induce members of the general public (including Plaintiffs) to do business with Coinbase for Coinbase's pecuniary gain.

**L.      Coinbase's Continued Misrepresentations and Security Failures**

131.     Coinbase's misrepresentations about its security continue to deceive members of the general public. These misrepresentations are targeted to entice consumers into creating accounts and depositing their hard-earned funds with Coinbase. These misrepresentations also continue to give current Coinbase accountholders false confidence that their funds are protected and secure with Coinbase.

132.     Upon information and belief, consumers other than Plaintiffs have suffered and continue to suffer security breaches and losses of funds similar to those experienced by Plaintiffs.

133.    Other consumers have similarly complained that cryptocurrency was stolen from their Coinbase accounts despite them taking the precautions that Coinbase recommends:





134.    Users on internet forums such as Reddit have also recently reported similar experiences losing funds on Coinbase due to security compromises, despite use of Coinbase's recommended two-factor authentication.

135.    One Reddit user posting to the /r/Coinbase community on Reddit, complained that "[m]y Coinbase account with Google authenticator enabled was just hacked."[10]

---

[10] @apollocrypto, Reddit (Aug. 23, 2018),
https://www.reddit.com/r/CoinBase/comments/99rbqd/my_coinbase_account_with_google_authenticator/.

136.    In April 2022, another Reddit user similarly complained on the /r/Coinbase community on Reddit that despite using Google Authenticator, "[s]omeone was able to access my account without my authorization" which resulted in the user losing $10,000 worth of Bitcoin.[11]

137.    Other victims have since come forward with similar allegations.

138.    On information and belief, one consumer claims that on or around August 10, 2022, he found he was locked out of his account. Despite attempting to contact Coinbase support, he was unable to access his account for several weeks during which time a hacker was able to access and empty his account of approximately $120,000. At no point did Coinbase take steps to prevent the theft.

**M.    Coinbase Is Causing Irreparable Harm**

139.    If Coinbase is permitted to continue its deceptive and misleading practices, members of the public will suffer irreparable injuries beyond the harm of losing substantial sums of money.

140.    Through the conduct alleged herein, Coinbase puts members of the public at risk of having their personal information misappropriated. Coinbase has admitted that hacks like those suffered by Plaintiffs allow hackers to obtain user's private information, including information like addresses and dates of birth. This access is not only a breach of privacy; this information can be used by hackers to get unauthorized access to other financial accounts, for identity theft, or other nefarious purposes—as hackers did by using Mr. Shah's credentials to try to access his other financial accounts. The harms flowing from breach of privacy and identify theft cannot be cured through money damages alone.

141.    Coinbase's lack of customer support—contrary to its representations—exacerbates these harms. Coinbase does not timely or adequately assist hacked customers with investigating the source or perpetrators of hacks, leaving customers without critical information they need to, among other things, file police reports, file insurance claims, change passwords or other account information on other accounts that may be vulnerable to similar hacks (including by virtue of hackers gaining customer information from hacking Coinbase accounts), or otherwise protect

---

[11] @ListenEducational890, Reddit (Apr. 8, 2022), https://www.reddit.com/r/CoinBase/comments/tz88mt/hacked_coinbase_account_lost_10k/.

1   themselves from further negative consequences from their Coinbase accounts being hacked and

2   their private information being compromised.

3       142.    Once consumers are misled into putting their money in Coinbase (instead of another

4   account or investment opportunity), they cannot go back in time and undo that choice. Money

5   damages are not an adequate remedy for depriving consumers of an informed choice about which

6   products or services to use and fail to remedy the opportunity cost of consumers who are deceived.

7   Misleading statements about its "security" are a cornerstone of Coinbase's marketing efforts.

8   Plaintiffs were induced to use Coinbase by those statements; other members of the public are likely

9   to do the same—and likely to be harmed by the same deception.

10      143.    Plaintiffs have already suffered (and continue to suffer) these harms, which are

11  likely to recur.

## CAUSES OF ACTION

### First Cause of Action
**Against All Defendants**
**Violation of Consumer Legal Remedies Act ("CLRA")**
**(Cal. Civ. Code §§ 1750, *et seq*.)**

16      144.    Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set

17  forth herein.

18      145.    For avoidance of doubt, Plaintiffs bring this CLRA claim to obtain only public

19  injunctive relief.

20      146.    At all relevant times, Plaintiffs were "consumers" under the terms of the CLRA:

21  individuals seeking or acquiring, by purchase or lease, goods or services for personal, family, or

22  household purposes.

23      147.    Defendants' actions and conduct constituted transactions for the sale or lease of

24  goods or services to consumers under the terms of the CLRA. The assets involved in the

25  unauthorized transactions are "goods" and Defendants' financial and online platform services are

26  "services" under the CLRA.

27

28

148.    As detailed above, Defendants have violated the CLRA by, among other things, representing that its services have "characteristics," "uses," and "benefits" "that they do not have." Cal. Civ. Code § 1770(a)(5).

149.    Defendants' misrepresentations were likely to deceive reasonable consumers. Defendants' violations of the CLRA were a substantial factor in causing Plaintiffs' harm and are likely to induce other members of the public to use Coinbase's services.

150.    As a direct and proximate consequence of the actions as identified above, Plaintiffs suffered damage and losses, and other members of the general public are likely to suffer similar injuries.

<u>**Second Cause of Action**</u>
**Against All Defendants**
**Violation of California False Advertising Law ("FAL")**
**(Cal. Bus. & Prof. Code §§ 17500, *et seq*.)**

151.    Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

152.    For avoidance of doubt, Plaintiffs bring this FAL claim to obtain only public injunctive relief.

153.    Defendants violated the FAL by seeking to induce consumers, including Plaintiffs, to do business with Defendants by disseminating false and misleading statements regarding Defendants' products and services and matters of fact associated with those products and services, as alleged above.

154.    Defendants' misrepresentations were likely to deceive reasonable consumers. Defendants' violations of the FAL were a substantial factor in causing Plaintiffs use Defendants' services and are likely to induce other members of the public to do the same.

155.    As a direct and proximate consequence of the actions as identified above, Plaintiffs lost money or property and have suffered injury and other members of the general public are likely to suffer similar injuries.

**Third Cause of Action**
**Against All Defendants**
**Violation of California Unfair Competition Law ("UCL")**
**(Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

156.    Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

157.    For avoidance of doubt, Plaintiffs bring this UCL claim to obtain only public injunctive relief.

158.    Plaintiffs and Defendants are "persons" within the meaning of the UCL. Bus. & Prof. Code § 17201.

159.    As alleged above, Defendants have engaged in unlawful, fraudulent and/or unfair conduct that are harmful and deceiving to consumers within the meaning of the UCL.

160.    Plaintiffs suffered an injury in fact and lost money or property as a result of Defendants' violations of the UCL.

161.    Defendants conduct is unlawful because it violates, among other laws, the FAL, CLRA, and Cal. Fin. Code §§ 560-562.

162.    Defendants' conduct is fraudulent because it is likely to deceive reasonable consumers, whether because certain statements are literally false or because Defendants' conduct otherwise has a capacity, likelihood or tendency to deceive or confuse the public.

163.    Defendants' conduct is unfair because it is substantially injurious to consumers, offends legislatively declared public policy as announced by the violations of the laws alleged, and is immoral, unethical, oppressive, and unscrupulous. The gravity and harmful effects of Defendants' wrongful conduct outweigh any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendants' legitimate business interests other than engaging in the above-described wrongful conduct.

164.    Defendants' unlawful, fraudulent, and unfair conduct identified above is ongoing and, unless enjoined by the Court, will continue to deceive and cause injury to the general public.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of the general public, pray that this Court enter judgment against Defendants and in favor of Plaintiffs, and issue the following relief:

A.     Public injunctive relief;

B.     Attorneys' fees and costs; and

C.     All such further relief as the Court deems just and proper.

Dated:  January 6, 2023                    Respectfully submitted,

                                           BRAUNHAGEY & BORDEN LLP


                                           By: _____
                                                J. Noah Hagey

                                           *Attorneys for Plaintiffs Manish Aggarwal, Mostafa El Bermawy, and Amish Shah*

# EXHIBIT C

**CM-010**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>J. Noah Hagey, Esq. (SBN: 262331); BraunHagey & Borden LLP, 351 California Street,<br>10th Floor, San Francisco, CA 94104 | *FOR COURT USE ONLY* |

TELEPHONE NO.: (415) 599-0210          FAX NO. *(Optional):*
E-MAIL ADDRESS: hagey@braunhagey.com
ATTORNEY FOR *(Name):* Manish Aggarwal, Mostafa El Bermawy, and Amish Shah

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street
CITY AND ZIP CODE: San Francisco, CA 94102-4514
BRANCH NAME: Civic Center Courthouse

**ELECTRONICALLY**
**F I L E D**
*Superior Court of California,*
*County of San Francisco*
**01/06/2023**
**Clerk of the Court**
BY: JEFFREY FLORES
Deputy Clerk

CASE NAME:
Manish Aggarwal, et al. v. Coinbase, Inc., et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: **CGC-23-603871** |
|---|---|---|
| [x] **Unlimited** [ ] **Limited**<br>(Amount (Amount<br>demanded demanded is<br>exceeds $25,000) $25,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br><br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[x] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [x] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties      d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel      e. [ ] Coordination with related actions pending in one or more issues that will be time-consuming to resolve            courts in other counties, states, or countries, or in a federal
   c. [ ] Substantial amount of documentary evidence            court
                                                      f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4. Number of causes of action *(specify):* 3 (Consumer Legal Remedies Act, False Advertising Law, Unfair Competition Law)
5. This case [ ] is [x] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: January 6, 2023
J. Noah Hagey
_____
(TYPE OR PRINT NAME)                                         (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev.September 1, 2021] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courts.ca.gov* |

CM-010

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**

**To Plaintiffs and Others Filing First Papers.**  If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1.  This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet.  In item 1, you must check **one** box for the case type that best describes the case.  If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below.  A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit.  A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment.  The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading.  A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice– Physicians & Surgeons
Other Professional Health Care Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
Intentional Infliction of Emotional Distress
Negligent Infliction of Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/ Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court Case Matter
Writ–Other Limited Court Case Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-harassment)*
Mechanics Lien
Other Commercial Complaint Case *(non-tort/non-complex)*
Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late Claim
Other Civil Petition

**CIVIL CASE COVER SHEET**

# EXHIBIT D

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:**    **JUN 07, 2023**

**TIME:**    **10:30 am**

**PLACE:**    **Department 610**
**400 McAllister Street**
**San Francisco, CA  94102-3680**

All parties must appear and comply with Local Rule 3.

---

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.  However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed and served twenty-five days before the case management conference.

---

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state. **This case is eligible for electronic filing and service per Local Rule 2.11.  For more information, please visit the Court's website at www.sfsuperiorcourt.org under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

### ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

---

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION,  AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**

(SEE LOCAL RULE 4)

---

Plaintiff **must** serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint.  (CRC 3.221.) The ADR package may be accessed at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution or you may request a paper copy from the filing clerk.  All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400  McAllister Street, Room 103-A**
**San Francisco, CA  94102**
**(415) 551-3869**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**

# EXHIBIT E

Contact Us

**THE SUPERIOR COURT OF CALIFORNIA**
COUNTY OF SAN FRANCISCO

Case Number: CGC23603871
Title: MANISH AGGARWAL ET AL VS. COINBASE, INC. ET AL
Cause of Action: BUSINESS TORT
Generated: 2023-01-25 9:12 am

Register of Actions    Parties    Attorneys    Calendar    Payments    Documents

**Please Note: The "View" document links on this web page are valid until 9:22:36 am**
**After that, please refresh your web browser. (by pressing Command +R for Mac, pressing F5 for Windows or clicking the refresh button on your web browser)**

# Register of Actions

Show [10] entries                                  Search: [            ]

| Date | Proceedings | Document | Fee |
|------|-------------|----------|-----|
| 2023-01-19 | SUMMONS ISSUED (TRANSACTION ID # 68851926) TO PLAINTIFF AGGARWAL, MANISH EL BERMAWY, MOSTAFA SHAH, AMISH ON BEHLAF OF THE CALIFORNIA PUBLIC | View | |
| 2023-01-06 | NOTICE TO PLAINTIFF | View | |
| 2023-01-06 | CIVIL CASE COVERSHEET FILED (TRANSACTION ID # 68824412) FILED BY PLAINTIFF AGGARWAL, MANISH EL BERMAWY, MOSTAFA SHAH, AMISH ON BEHLAF OF THE CALIFORNIA PUBLIC | View | |
| 2023-01-06 | BUSINESS TORT, COMPLAINT (TRANSACTION ID # 68824412) FILED BY PLAINTIFF AGGARWAL, MANISH EL BERMAWY, MOSTAFA SHAH, AMISH ON BEHLAF OF THE CALIFORNIA PUBLIC AS TO DEFENDANT COINBASE, INC. COINBASE GLOBAL, INC. NO SUMMONS ISSUED, JUDICIAL COUNCIL CIVIL CASE COVER SHEET NOT FILED CASE MANAGEMENT CONFERENCE SCHEDULED FOR JUN-07-2023 PROOF OF SERVICE DUE ON MAR-07-2023 CASE MANAGEMENT STATEMENT DUE ON MAY-15-2023 | View | $435.00 |

Showing 1 to 4 of 4 entries                            Previous   [1]   Next

# EXHIBIT F

1  J. Noah Hagey, Esq. (SBN: 262331)
       hagey@braunhagey.com
2  Matthew Borden, Esq. (SBN: 214323)
       borden@braunhagey.com
3  Jeffrey M. Theodore, Esq. (SBN: 324823)
       theodore@braunhagey.com
4  Ronald J. Fisher, Esq. (SBN: 324823)
       fisher@braunhagey.com
5  BRAUNHAGEY & BORDEN LLP
   351 California Street, 10th Floor
6  San Francisco, CA 94104
   Telephone: (415) 599-0210
7  Facsimile: (415) 276-1808

8  ATTORNEYS FOR PLAINTIFF
   OPTRONIC TECHNOLOGIES, INC.

9

10

11                     **UNITED STATES DISTRICT COURT**

12                   **NORTHERN DISTRICT OF CALIFORNIA**

13

14
                                              | Case No: 5:16-cv-06370-EJD-VKD
15  OPTRONIC TECHNOLOGIES, INC., d/b/a        |
    Orion Telescopes & Binoculars ®, a California  | **PLAINTIFF OPTRONIC**
16  corporation,                              | **TECHNOLOGIES, INC.'S MOTION**
                                              | **FOR ATTORNEYS' FEES AND COSTS**
17               Plaintiff,                    | **PURSUANT TO 15 U.S.C. § 15(a)**

18           v.                                | **Date:**      February 20, 2020
                                              | **Time:**      9:00 A.M.
19  NINGBO SUNNY ELECTRONIC CO., LTD.,        | **Judge:**     Hon. Edward J. Davila
    SUNNY OPTICS, INC., MEADE                 | **Location:**  Courtroom 4 – 5th Fl.
20  INSTRUMENTS CORP., and DOES 1 - 25,       |
                                              | **Compl. Filed:**       Nov. 1, 2016
21               Defendant.                    | **First Am. Compl.:**   Nov. 3, 2017
                                              | **Final Pretrial Conf.:** Oct. 10, 2019
22                                            | **Trial Date:**         Oct. 15, 2019

23                                            | **Verdict:**            Nov. 26, 2019

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on February 20, 2020, at 9:00 a.m., in Courtroom 4, 5th Floor, 280 South 1st Street, San Jose, California, before the Honorable Edward J. Davila, Plaintiff Optronic Technologies, Inc. ("Orion") will and hereby does respectfully bring this Motion for an award of Orion's reasonable attorneys' fees and costs under 15 U.S.C. § 15(a), Fed. R. Civ. P. 54(d), and Civil Local Rules 54-1 and 54-5.

On December 5, 2019, the Court entered partial judgment on the jury's verdict (Dkt. No. 501) (the "Verdict") in favor of Orion and against defendant Ningbo Sunny Electronic Co. Ltd. ("Ningbo Sunny") as to Orion's claims for damages under the Sherman and Clayton Acts and the California Cartwright Act (the "Judgment," Dkt. No. 518). The Court entered the Judgment in the amount of $50,400,000, in accordance with the Verdict's award of $16,800,000 in damages as trebled pursuant to 15 U.S.C. § 15(a). Further, as required by 15 U.S.C. § 15(a), the Court awarded Orion "its costs of suit and reasonable attorney's fees[.]" (Dkt. No. 515 at 1-2.) As discussed in the accompanying Memorandum of Points and Authorities, and as established in the accompanying Declaration of J. Noah Hagey (the "Hagey Decl."), the amounts owed to Orion's counsel, the law firm BraunHagey & Borden, LLP ("BHB") are:

**Attorneys' Fees: $4,204,664.80**. This figure is net of approximately **$122,000** in write-offs and items excluded from the fee application, as well as an additional five percent reduction of **$221,298.15**, for a total reduction of over **$343,000**.

**Clayton Act Recoverable Costs: $778,117.02**

**Total Attorneys' Fees and Costs: $4,982,781.87**.

Orion also respectfully requests that its counsel at BHB be paid the reasonable fees and expenses incurred in preparing and litigating this Motion. *See Camacho v. Bridgeport Fin'l, Inc.*,

1   523 F.3d 973, 981 (9th Cir. 2008) (attorney fee awards appropriately include the time spent

2   preparing and litigating the motion to obtain a fee award ("fees on fees")).[1]

3          This Motion is based upon this Notice of Motion and Motion, the points and authorities in

4   the accompanying Memorandum of Points and Authorities, the Hagey Decl., the complete files and

5   records in this action, oral argument of counsel, authorities that may be presented at or before the

6   hearing, and such other and further matters as this Court may consider.

9   Dated:  January 16, 2020                          Respectfully Submitted,

10                                                     BRAUNHAGEY & BORDEN LLP

11
                                                       By:    /s/ *J. Noah Hagey*
12                                                            J. Noah Hagey

13                                                     Attorneys for Plaintiff OPTRONIC
                                                          TECHNOLOGIES, INC. d/b/a Orion
14                                                        Telescopes & Binoculars ®

---

27  [1] While some of those hours and expenses have already been incurred and are thus part of this
28  Motion, Orion cannot ascertain the total additional amounts until the parties conclude litigation of
    this Motion.  Orion will itemize those amounts at that time.

Plaintiff Optronic Technologies, Inc. ("Orion") respectfully submits this Memorandum of Points and Authorities in Support of its Motion for Attorneys' Fees and Costs under 15 U.S.C. § 15(a), Fed. R. Civ. P. 54(d), and Civil Local Rules 54-1 and 54-5.

## **INTRODUCTION**

After four years of litigation and six weeks of trial, the sun finally set on this litigation when the jury rendered a verdict in Orion's favor on all counts and awarded $50,400,000 in damages after mandatory trebling. As expressly recognized in the partial judgment entered on Orion's damages claims, Orion is entitled to recover its cost of suit including reasonable attorney's fees pursuant 15 U.S.C. § 15(a). As set forth below, Orion's attorneys' fees and costs incurred in this matter total $5,204,080.02. Given the complexity of this antitrust case, the way Defendants elected to defend the case, and Orion's counsel's lean staffing and efficient legal services, the fees Orion requests here are reasonable and should be awarded in full. Indeed, as revealed in Meade's recent bankruptcy filings, Defendants incurred over $9,000,000 in fees and costs in this litigation from just one of the two big firms they employed, alone—nearly double what Orion seeks here.

This litigation served not only Orion's own interest, but also the interest of the public and of all persons who wish to gaze at the stars through a telescope. If Orion had not brought this suit and persisted through years of contentious litigation, Defendants would be continuing to dominate the market and overcharge consumers, and would have destroyed Orion, leaving consumers with no choice but to purchase telescopes from the colluders at monopoly prices.

To prevail in this case, Orion and its counsel, BraunHagey & Borden LLP ("BHB"), faced the Herculean task of proving that Defendants engaged in a complex antitrust conspiracy with their competitors that sprawled over multiple continents. This undertaking involved extensive pre-suit and post-suit investigation, review and analysis of over 6.5 million pages of documents, many of which were in Mandarin, and numerous depositions and experts. Further, Defendants created unnecessary expenses by violating Court Orders and engaging in other discovery misconduct, which resulted in Judge DeMarchi re-opening the depositions of three defense witnesses and sanctioning Defendants – a sanction Defendants still have not paid. This course of conduct increased expenses, prolonged discovery and derailed the Court-Ordered case management dates.

ORION'S MOTION FOR ATTORNEYS' FEES AND COSTS

In the end, Orion not only prevailed at trial, but did so while spending *nearly half* of what Defendants spent in attorney's fees and costs. As detailed in the accompanying Declaration of J. Noah Hagey ("Hagey Decl."), BHB maintained a lean litigation team and actively worked to minimize costs throughout two rounds of motions to dismiss, countless discovery disputes, working with experts, making and opposing summary judgment motions, and preparing for and conducting a trial that lasted six weeks. In addition to the billing judgment exercised in the course of the representation, in preparing this motion, BHB has further written off substantial time to account for any inefficiencies. Accordingly, Orion respectfully submits that the Court should grant the full amount of costs and attorneys' fees requested in the Motion.

## ARGUMENT

### I. THE CLAYTON ACT MANDATES AN AWARD OF COSTS, INCLUDING REASONABLE ATTORNEY'S FEES

Section 4 of the Clayton Act provides that a person injured by an antitrust violation *shall* recover, in addition to treble damages, "the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). This award is mandatory. *Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 136 F.3d 1354, 1357 (9th Cir. 1998). The purpose of the award is: "1) to encourage private enforcement of the antitrust laws, 2) to insulate the treble damages award from the costs of obtaining recovery, and 3) to deter violations of the antitrust laws by requiring the payment of that fee by a losing defendant as part of his penalty for having violated the antitrust laws." *Id.* (citing *Perkins v. Standard Oil*, 474 F.2d 549, 554 (9th Cir. 1973)). Accordingly, it is beyond dispute that BHB is entitled to an award of fees and costs.

### II. BHB'S REQUESTED FEES AND COSTS ARE REASONABLE

The Supreme Court has emphasized that, with respect to the fee-shifting provision under 42 U.S.C. § 1988, "counsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client, '*for all time reasonably expended on a matter.*'" *City of Riverside v. Rivera*, 477 U.S. 561, 575 (1986) (citation omitted) (emphasis original). The same is true in antitrust cases. *See, e.g., Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1313 (9th Cir. 1982) (reasonable fees and costs include "every item of service which, at

the time rendered, would have been undertaken by a reasonable and prudent lawyer to advance or protect his client's interest…."); *In re TFT-LCD (Flat Panel) Antitr. Litig.*, N. M:07-cv-1827-si, 2014 WL 12635766, *5 (N.D. Cal. Feb. 3, 2014).

Courts often use the "lodestar" method to determine the reasonableness of attorney fees. *Jordan v. Multnomah County*, 815 F.2d 1258, 1262 (9th Cir. 1987). "The 'lodestar' is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir.1996). The prevailing party must submit evidence of the appropriate hours expended on the litigation and establish that its requested hourly rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. *Masimo Corp. v. Tyco Health Care Group, L.P.*, No. CV 02-4770 MRP (AJWx), 2007 WL 5279897, *2 (C.D. Cal. Nov. 5, 2007) (citations omitted). In analyzing the hourly rates, a court can also consider: (1) the novelty and complexity of the issues; (2) the special skill and experience of counsel; (3) the quality of representation; and (4) the results obtained. *See Caplan v. CNA Fin. Corp.*, 573 F.Supp.2d 1244, 1249 (N.D. Cal. 2008). There is a "strong presumption" that the lodestar figure represents a reasonable attorneys' fee. *Masimo*, 2007 WL 5279897 at *1.[2]

In keeping with these principles, the Hagey Declaration and the exhibits thereto set forth the hours expended on this litigation by BHB; the names of the attorneys, paralegals, and other support staff performing the services; the hourly rates for those individuals; and the lodestar amounts. An examination of that data confirms that the requested fees are reasonable.

**A.    BHB's Hourly Rates Are Reasonable**

BHB is a twenty-lawyer boutique litigation firm based in San Francisco and New York that routinely handles high-profile, complex litigation involving antitrust, unfair competition, and other commercial matters. (Hagey Decl. ¶ 4.) BHB regularly appears before federal and state courts

---

[2] Given the magnitude and complexity of this case, Defendants' numerous discovery failures, the vigorous defense asserted by Defendants, and the amount recovered (more than $16,000,000 before trebling), Orion would be well within its rights to seek a *multiplier* of the lodestar under the factors set forth in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975) (abrogated on other grounds by *City of Burlington v. Dague*, 505 U.S. 557 (1992)) and *Twentieth Century Fox Film Corp. v. Goldwyn*, 328 F.2d 190, 221 (9th Cir. 1964). Orion has not, however, elected to do so.

1   throughout the country to prosecute and defend claims involving a variety of business issues. (*Id.*)

2   BHB's clients run from Fortune 500 Companies to small businesses and encompass many different

3   types of industries. (*Id.* ¶ 5.)

4        BHB has successfully litigated and arbitrated disputes exceeding many billions of dollars,

5   often involving disputes closely watched by industry observers and media. (*Id.*)  Our litigators

6   learned their craft at some of the most respected law firms in the world, including Quinn Emanuel

7   Urquhart & Sullivan LLP, Keker & Van Nest LLP, Morrison & Foerster LLP, Latham & Watkins

8   LLP, and Steptoe & Johnson LLP, and many of our lawyers are former federal district or appellate

9   court clerks. (*Id.* ¶ 6.)  And BHB partners have been called on by judges of this District to serve as

10  special masters. (*Id.*)

11       BHB's rates are reasonable and consistent with the prevailing hourly rates charged by

12  lawyers of reasonably comparable skill, experience and reputation in the relevant community.

13  *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008).  Generally, when determining

14  a reasonable hourly rate, the relevant community is the forum in which the district court sits. *Id.*

15  Accordingly, the relevant community in the present case is the Northern District of California.

16       As shown in the Hagey Declaration, the rates requested here range from $795 per hour for

17  BHB's most senior and experienced partners, to $425 per hour for the firm's more junior lawyers.

18  (Hagey Decl. ¶ 8.)  Each attorney's rate reflects his or her standard billing rate, which is derived

19  from his or her level of seniority and experience, and which is what clients actually pay BHB for

20  their services. (*Id.*)  BHB's paralegal rates are likewise within a reasonable range reflecting

21  seniority and experience.

22       Numerous courts, including the Ninth Circuit, and courts in the Northern District of

23  California, have already considered BHB's hourly rates in other matters and found them

24  reasonable. *See, e.g.*, *Walker v. B&G Foods, Inc., et al.*, Case No. 16-15349 (ECF No. 26) (9th

25  Cir., Jul. 20, 2017).  (Hagey Decl. ¶ 8.)

26       Comparing BHB's hourly rates to those charged by other law firms in the Northern District

27  also establishes that BHB's rates are in line with, or lower than, those charged by other firms in the

28  community.  Nearly all of Orion's BHB lawyers were previously affiliated with large, national law

firms, all of which charged higher rates than BHB is seeking here. (*Id.*, ¶¶ 9, 15, 18, 21, 24, 27, 33, 36.)

Other courts in this District have granted similar fee requests to lawyers in antitrust cases. For example, in an April 1, 2013 Order in *Flat Panel*, Judge Illston evaluated and approved a fee petition from more than 100 law firms. Although that decision is nearly six years old (and thus would likely reflect higher rates if decided today) the hourly attorney rates approved in that case ranged from $350 to $1,000. *Flat Panel*, MDL 07-1827 (N.D. Cal.), Dkt. 7688 at 14. That decision confirms that BHB's requested rates of between $425 and $795 are reasonable and consistent with the prevailing hourly rates charged by lawyers in complex antitrust disputes in the Northern District of California.

## B. BHB's Total Expended Hours Are Reasonable

In contrast to Defendants, who were represented by a large firm with dozens of lawyers at their disposal, Orion was represented by BHB, a firm with a total of twenty lawyers who, as explained above, staffed the case as leanly as possible. As shown in the Hagey Declaration, the time requested herein for the work BHB performed was reasonably and necessarily expended in prosecuting this case.

Lead counsel for Orion has carefully reviewed the detailed description of all work performed by its lawyers and paralegals in this case, and he has exercised billing judgment to ensure that none of the time for which Orion seeks reimbursement is excessive or redundant. (Hagey Decl., ¶ 57.) In specific, BHB wrote off over **$122,000** in billings to Orion. (*Id.*) Moreover, BHB is writing off a further five percent of its total billing in connection with this motion, totaling an additional **$221,298.15**. Thus, in total, BHB has written off over **$343,000** in fees to ensure that there are no redundancies in the fees sought by this motion. (*Id.*)

This was a hard-fought, highly complex antitrust litigation. To prevail in this action, Orion had to: conduct a lengthy investigation prior to filing the Complaint; prepare and file initial and amended pleadings; oppose two motions to dismiss; take and defend numerous depositions, including of non-English speakers (including taking many of those depositions a second time as a result of the Court's orders sanctioning Defendants); bring review and organize nearly 6.5 million

1   pages of documents, many of which were written Mandarin and required translation; meet and

2   confer and file twelve discovery dispute letters to obtain Judge DeMarchi's assistance to obtain

3   relief from Defendants' misconduct in discovery; oversee Orion's experts preparing reports on

4   complex economic concepts and telescope manufacturing; analyze and challenge the work of

5   Defendants' experts (including by successfully moving to exclude one of Defendants' experts);

6   move for summary judgment and oppose Defendants' motion for summary judgment; prepare and

7   file *Daubert* motions (one of which prevailed), prepare for and conduct a six-week jury trial; and

8   brief post-trial motions, including this motion for fees and costs.  (*Id.* ¶ 61.)

9       Unlike many antitrust cases in which private plaintiffs 'piggyback' on prior litigation or

10   investigations brought by the Department of Justice, Orion developed and prosecuted this case

11   entirely on its own.  The fees and expenses presented here are the fees and expenses that Orion

12   actually incurred in the prosecution of this case, a three year-plus legal struggle against a well-

13   funded adversary who employed a firm that has more than 800 lawyers around the world.

14   Defendants here—as well-funded Defendants tend to do—repeatedly sought to delay and frustrate

15   the efficient resolution of this litigation.  Orion's perseverance resulted in total victory and a

16   significant benefit to the telescope market and telescope consumers.

17       In short, BHB performed the work that "a reasonable and prudent lawyer" would have

18   performed "to advance or protect his client's interest" in preparing this complex antitrust case for

19   trial.  *Twin City*, 676 F.2d at 1313.  Further, the complete and total success that BHB achieved in

20   this case – wherein the jury found in Orion's favor on every single claim before it and awarded

21   damages that amount to over $50 million after trebling – further establishes that BHB conducted a

22   reasonable and prudent litigation.  Accordingly, the hours BHB expended are fully compensable.

23       **C.    Orion's Costs Are Reasonable**

24       Orion's costs are also reasonable.  As numerous courts have acknowledged, fee-paying

25   clients typically bear the costs of computerized legal research; attorney travel; photocopying;

26   printing; overnight mail and messengers; and document database hosting, among other charges.

27   *Trs. of the Constr. Indus. & Laborers Health & Welfare Trust v. Redland Ins. Co.*, 460 F.3d 1253,

28

1259 (9th Cir. 2006); *Blackwell v. Foley*, 724 F.Supp.2d 1068, 1080 (N.D. Cal. 2010).[3] Accordingly, and as detailed in the **Exhibit 1** to the Hagey Declaration, Orion seeks **$778,117.02** in costs relating to experts, jury consultants, translation services, court reporters and videographers, transportation, lodging, meals, and other expenses ordinarily incurred and paid by clients in litigation to further their interests—all of which are compensable under the Clayton Act. (Hagey Decl. Ex. 1.)

### D. Defendants Cannot Be Heard to Complain that Orion's Fees and Expenses are Unreasonable Because They Are *Nearly Half* Defendants' Fees and Expenses

As the Court is aware, Ningbo Sunny's co-defendant, Meade Instruments Corp. ("Meade"), recently filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Central District of California (the "Meade Bankruptcy"). A recent filing Meade made in those proceedings shows that in the second big law firm representing Ningbo Sunny in this action, Sheppard, Mullin, Richter & Hampton LLP ("Sheppard Mullin"), *billed over $9,000,000 in fees and costs* in this litigation—nearly *$4,000,000 more than Orion's total fees and costs*. (Hagey Decl., ¶ 63 and Ex. 2 at 3:11-12.)[4]

The fact that Orion's sum total of requested fees and costs is at least *nearly half* the amount Defendants' own lawyers charged Defendants to defend this action establishes beyond a doubt that BHB's fee request is reasonable. Orion's relatively low fees and costs reflect BHB's efforts to staff leanly and avoid duplicative or unnecessary tasks. Ningbo Sunny cannot plausibly argue that Orion's bills in successfully litigating this case were unreasonable when its own fees were nearly *twice* that amount.

### E. Orion's Fees Are All the More Reasonable Given Defendants' Litigation Conduct, Which Forced Orion to Repeatedly Seek Relief From This Court

Defendants especially should not be heard to object to Orion's fees given that Defendants' own dilatory tactics increased the cost of litigating this matter. Defendants' consistent efforts to

---

[3] Because Orion is entitled to all of its costs under the Clayton Act's fee shifting provision, Orion is not filing a separate Bill of Costs as would be required to obtain the limited categories of compensable costs in a normal case. Orion is happy to prepare and file a separate Bill of Costs if the Court prefers.

[4] Prior to Sheppard Mullin, Ningbo Sunny was represented by Mayer Brown. Orion does not know how much Mayer Brown billed in addition to what Sheppard Mullin charged.

ORION'S MOTION FOR ATTORNEYS' FEES AND COSTS

thwart discovery required extensive motion practice and hearings (including Orion's successful motion for sanctions[5]), as well as multiple extensions of the Court's case schedule that greatly delayed resolution , and increased expenses, of this case.  To list just a few examples, Defendants caused Orion to incur additional costs and fees by:

- Refusing to produce documents responsive to Orion's discovery requests while their Motions to Dismiss were pending, despite having no justification or legal basis to engage in such self-help;

- Repeatedly representing to Orion and the Court that they had completed their document production, only to repeatedly supplement their production weeks later with tens or hundreds of thousands of additional pages of responsive materials, after the deadlines for initial and supplemental productions had passed;

- Falsely representing that their production was complete before they had even searched the files of Ningbo Sunny's CEO, Peter Ni;

- Repeatedly withholding crucial documents and information that were damaging to their case without justification, including *direct evidence of collusion* (an email in which an executive of Meade admitted that Defendants were planning to cooperate with their purported competitors for the benefit of the entire group);

- Withholding highly relevant and damaging documents until after key depositions of witnesses named in those documents and refusing to allow Orion to further depose those witnesses about the late-produced documents;

- Withholding documents on privilege grounds when there was not even a colorable argument for doing so; and

- Providing misleading and evasive responses to written discovery.

(Hagey Decl. ¶ 64.)  In stark contrast, not a single motion to compel was filed against Orion during this entire case.  (*Id.*)

---

[5] Judge DeMarchi's Order required Defendants to re-produce their witnesses for deposition to pay Orion's costs and fees associated with those depositions.  Despite Orion's repeated demands, Defendants have still not paid Orion.

The Court has already noted that Defendants' sharp tactics forced Orion to expend considerable extra time and money to obtain discovery to which it was entitled.  At the October 23, 2018 hearing on Orion's motion for discovery sanctions, Judge DeMarchi stated:

> [O]ne reading of this whole scenario is that the people managing the discovery [for Defendants] were making decisions about how to get it done in a way that log[s] privileged things that weren't privileged, didn't investigate the relevant sources for material, and *but for the efforts of the Plaintiff in plowing through documents and raising these things*, there would have been a very inadequate – there was a very inadequate discovery effort on the part of the Defendants."

(*Id*. at 68:1-8 (emphasis added).)

At the same hearing, the Court also admonished Defendants for serving misleading and evasive written discovery regarding the key fact that David Shen's sister-in-law owns a substantial interest in Ningbo Sunny: "[T]he initial responses to the requests for admissions do appear to be misleading and evasive and incomplete at the very least."  (*Id*. at 73:12-20.)

In sum, Orion's fees and costs are reasonable given that Defendants' own misconduct greatly increased the cost of litigating this case.

## F. Per the Court's Instruction, Orion Has Specific Billings Available Should the Court Wish to Inspect Them

After the jury issued its verdict on November 26, 2019, the Court provided guidance as to how Orion should proceed with respect to documentation of its billings.  The Court stated:

> It could be that you're going to supply, either in some sealed fashion, the billings that you have that have the appropriate documentation for the Court to review.  You could – you should at a minimum have those available should the Court wish to inspect them, or if the Court decides that it's appropriate, the Court could appoint a special master to review the billings to see accommodations and those types of things."

(11/26/2019 Trial Tr. at 2830:15-22.)  Orion's actual time entries contain significant amounts of attorney work product and potentially privileged materials.  Orion is willing to provide its actual billings to the Court in a manner that protects those privileges should the Court determine that is necessary.

## CONCLUSION

For the foregoing reasons, Orion respectfully requests that the Court grant this Motion and award Orion its requested costs and attorneys' fees in full.


Dated: January 16, 2020                                    BRAUNHAGEY & BORDEN LLP


                                                           By:    /s/ J. Noah Hagey
                                                                  J. NOAH HAGEY

                                                           Attorneys for Plaintiff OPTRONIC
                                                           TECHNOLOGIES, INC. d/b/a Orion
                                                           Telescopes & Binoculars

ORION'S MOTION FOR ATTORNEYS' FEES AND COSTS

1    J. Noah Hagey, Esq. (SBN: 262331)
         hagey@braunhagey.com
2    Matthew Borden, Esq. (SBN: 214323)
         borden@braunhagey.com
3    Jeffrey M. Theodore, Esq. (SBN: 324823)
         theodore@braunhagey.com
4    Ronald J. Fisher, Esq. (SBN: 324823)
         fisher@braunhagey.com
5    BRAUNHAGEY & BORDEN LLP
     351 California Street, 10th Floor
6    San Francisco, CA 94104
     Telephone: (415) 599-0210
7    Facsimile: (415) 276-1808

8    ATTORNEYS FOR PLAINTIFF
     OPTRONIC TECHNOLOGIES, INC.
9

10

11                        **UNITED STATES DISTRICT COURT**

12                     **NORTHERN DISTRICT OF CALIFORNIA**

13

14                                                  Case No: 5:16-cv-06370-EJD-VKD

15   OPTRONIC TECHNOLOGIES, INC., d/b/a          **DECLARATION OF J. NOAH HAGEY**
     Orion Telescopes & Binoculars ®, a California  **IN SUPPORT OF PLAINTIFF**
16   corporation,                                **OPTRONIC TECHNOLOGIES, INC.'S**
                                                 **MOTION FOR ATTORNEYS' FEES**
17              Plaintiff,                        **AND COSTS**

18         v.                                    **Date:**      February 20, 2020
                                                 **Time:**      9:00 A.M.
19   NINGBO SUNNY ELECTRONIC CO., LTD.,          **Judge:**     Hon. Edward J. Davila
     SUNNY OPTICS, INC., MEADE                   **Location:**  Courtroom 4 – 5th Fl.
20   INSTRUMENTS CORP., and DOES 1 - 25,
                                                 **Compl. Filed:**       Nov. 1, 2016
21              Defendant.                        **First Am. Compl.:**   Nov. 3, 2017
                                                 **Final Pretrial Conf.:** Oct. 10, 2019
22                                               **Trial Date:**          Oct. 15, 2019

23                                               **Verdict:**             Nov. 26, 2019

24

25

26

27

28

I, J. Noah Hagey, Esq., declare:

1.       I am licensed to practice before this Court and am lead counsel of record for Plaintiff Optronic Technologies, Inc. ("Orion"). I make this declaration in support of Orion's Motion for Attorneys' Fees and Costs based on my own personal knowledge. If called as a witness, I could and would testify competently to the facts stated herein.

2.       My firm, BraunHagey & Borden LLP ("BHB"), was retained in or around October 2016 to help investigate, evaluate, and prosecute claims relating to Defendants' Ningbo Sunny Electronic Co., Ltd., Sunny Optics, Inc., and Meade Instruments Corp. (collectively, "Defendants") and their co-conspirators' violations of the federal and state antitrust laws. Over the ensuing three years, my firm has litigated this case through pleading, motions to dismiss, discovery, summary judgment, and trial, ending with a verdict in favor of Orion on all claims and a trebled damage award of over $50,000,000.

3.       As both the managing partner of BHB and lead counsel in this matter, I am familiar with, and responsible for, my firm's billing practices and its billing in this matter.

### A.    BHB Qualifications and Rates

4.       BHB is a leading litigation and trial boutique based in San Francisco and New York that routinely handles high-profile, complex litigation involving antitrust, unfair competition, and other commercial matters. We regularly appear before federal and state courts throughout the country to prosecute and defend claims involving a variety of business issues.

5.       Our clients run from Fortune 500 Companies to small businesses and encompass many different types of industries. We have successfully litigated and arbitrated disputes exceeding many billions of dollars, often involving disputes closely watched by industry observers and media.

6.       Our litigators learned their craft from some of the most respected law firms in the world, including Quinn Emanuel Urquhart & Sullivan LLP, Keker & Van Nest LLP, Morrison & Foerster LLP, Latham & Watkins LLP, and Steptoe & Johnson LLP.

7.      In addition to complex commercial litigation, we also handle significant pro bono and impact litigation assignments, and our partners have been called upon to serve as special masters in federal court, including in the Northern District of California.

8.      BHB's rates range from $795 per hour for partners to $425 per hour for associates. Most of our clients, including Orion, pay for our firm's services on an hourly basis.  The rates given below are the rates that BHB clients, and Orion, actually paid in this case.  Our firm's rates have been approved in fee application decisions issued by numerous courts, including the Ninth Circuit in *Walker v. B&G Foods, Inc., et al.*, Case No. 16-15349 (9th Cir., Jul. 20, 2017), courts in this District in *Hill v. Robert's Am. Gourmet Food, Inc*., No. C 13-80166 EDL (N.D. Cal.), and California state courts in *Davis v. AG Seal Beach, LLC, et al*., Case No. BC468346 (Los Angeles Super. Ct.), and *State of California ex rel. Todd Dominguez v. En Pointe Techs. Inc*., et al., Case No. 37-2011-00100936-CU-BTL (San Diego Super. Ct.).

9.      I am the co-founder and managing partner of BHB.  I graduated as a President's Scholar from the University of Texas School of Law in 2001 and served as an extern law clerk for then-Chief Justice Thomas Philips of the Texas Supreme Court.  Following graduation, I was admitted to the bars of the State of New York and California, and practiced at Quinn Emanuel Urquhart & Sullivan LLP in New York and San Francisco before founding BHB in 2009.

10.      For the past five years I have been designated as a SuperLawyer by my peers in California in the field of commercial litigation, a selection for which less than 5% of practicing attorneys in that discipline are recognized.

11.      As lead trial counsel in state and federal courts across the country, I have led client victories in cases involving virtually every species of complex commercial or unfair competition litigation, including without limitation: antitrust and competition, trade secrets, securities fraud, fiduciary duty, cryptocurrency and blockchain, private equity track record, trade secrets, and suitability.  Decisions from my cases have been featured in various industry and legal publications, including Reuters, American Lawyer, National Law Journal, Law360, HedgeFundNet, Futures, CFO and The Recorder.  My standard billing rate is $795/hour and was actually charged to Orion in this case, although many clients pay a higher rate for certain intensive engagements.  My hourly

1  rate is the rate that I use on client pitches and is the standard rate my clients actually pay for my

2  services.  It is the rate that Orion is paying for my services in this case.

3       12.    I personally review and exercise billing judgment over BHB's invoices and billing.

4  In this case, I wrote off over $122,000 in billable time in order to ensure that Orion was receiving

5  efficient services from BHB.

6       13.    As lead trial counsel in this matter, I supervised virtually all substantive issues in the

7  case, including developing the case for filing; discovery strategy and direction; arguing numerous

8  motions; participating in discussions regarding deposition strategy and preparation; participation in

9  briefing of important and dispositive motions; preparation of the case for trial; and trial of the case.

10      14.    I billed 962.0 efficient hours in this matter through December 31, 2019, totaling

11  $756,860.00 in fees.

12      15.    **Matthew Borden** is a partner in my firm.  After law school, Mr. Borden clerked for

13  the Honorable William Alsup in the United States District Court for the Northern District of

14  California.  Mr. Borden then practiced at Morrison & Foerster LLP before co-founding BHB.  Mr.

15  Borden has tried cases in state and federal court and argued appeals before numerous courts,

16  including the Ninth Circuit.  Mr. Borden has successfully represented Fortune 500 companies,

17  private equity funds, financial institutions, and foreign governments in billion-dollar lawsuits and

18  other high-stakes litigation (some of his former clients include Bank of America, Kyocera Corp.,

19  Wells Fargo Bank, and the Government of Egypt).  Mr. Borden has successfully prosecuted high-

20  stakes litigation against similar entities, such as BNY Mellon, Deloitte & Touche, Mizuho Bank,

21  Shinsei Bank, Citibank, National City Bank, and the Government of Japan.  Mr. Borden has also

22  been appointed to serve as a special master regarding fee disputes in complex cases in this District.

23  Mr. Borden's standard billing rate is $775/hour and was actually charged to Orion in this case.

24  This is the rate used on BHB's client pitches and the rate that clients pay for Mr. Borden's services.

25      16.    Mr. Borden served as "second chair" and was responsible for the day-to-day

26  litigation of this case from inception through trial.  Mr. Borden supervised the BHB team members

27  working on the case, played a central role in the development of Orion's case strategy and the

28  implementation of that strategy, coordinated all aspects of written discovery, took and defended the

1  most significant fact witness depositions, oversaw and participated in the drafting of all briefing in

2  the case, argued motions, and was centrally involved in all aspects of trial preparation and trial.

3          17.     Mr. Borden billed 1,550.1 efficient hours in this matter through December 31, 2019,

4  totaling $1,112,287.50 in fees.

5          18.     **Jeffrey Theodore** is a partner in my firm. Mr. Theodore graduated from Harvard

6  Law in 2006 and is an experienced trial lawyer who has obtained verdicts for and against some of

7  the world's largest companies in eight- and nine-figure litigation. As an oral advocate, Mr.

8  Theodore has secured ground-breaking rulings in high stakes litigation that made new law and

9  received extensive press coverage in both legal publications and the mainstream press. Mr.

10  Theodore's rate is $725 per hour and was actually charged to Orion in this case. This is the rate we

11  use for client pitches and the rate that clients pay for Mr. Theodore's services.

12          19.     Mr. Theodore had primary responsibility for the damages aspect of this litigation.

13  Mr. Theodore worked with Orion's damages expert, prepared and defended him at deposition,

14  deposed Defendants' damages experts, drafted or oversaw the drafting of *Daubert* motions and

15  oppositions, argued *Daubert* questions at the pre-trial conference, assisted in the preparation for

16  testimony and cross-examination of the damages experts at trial, and had substantial involvement in

17  discovery and scheduling disputes related to damages.  Mr. Theodore also participated in other

18  aspects of the case, including summary judgment briefing and trial preparation and strategy.

19          20.     Mr. Theodore billed 386.45 efficient hours in this matter through December 31,

20  2019, totaling $280,358.75 in fees.

21          21.     **Ronald Fisher** is an associate at my firm.  After law school, Mr. Fisher clerked for

22  the Honorable Michelle T. Friedland of the United States Court of Appeals for the Ninth Circuit,

23  and then practiced as an associate in Latham & Watkins LLP's antitrust and complex commercial

24  litigation practices before joining BraunHagey & Borden LLP.  Mr. Fisher graduated from the

25  University of Virginia Law School and was elected to the Order of the Coif.  He also served as an

26  Articles Editor for, and was published in, the *Virginia Law Review*.  Mr. Fisher has experience

27  trying cases in federal court, state court, and private arbitration, and has worked on appeals before

28  both the Ninth Circuit and the Supreme Court of the United States.  His standard billing rate is

1  $475 an hour.  That is the rate clients (including Orion) actually pay for his services and the rate we

2  use in client pitches.

3         22.     Mr. Fisher was the lead associate on this case from March 2018 through trial, the

4  period during which most of the litigation of this matter occurred.  Mr. Fisher was responsible for

5  all aspects of this litigation, including the significant and complex collection, review, and

6  production of voluminous ESI in this antitrust case, managing translation of Chinese language

7  documents produced by Defendants, managing review of Defendants' discovery and document

8  productions, reviewing Orion's extensive production for privilege issues, meeting and conferring

9  with opposing counsel regarding numerous discovery disputes, drafting and arguing numerous

10  motions, managing pretrial preparation and exchanges, drafting and arguing jury instructions,

11  deposing and defending the depositions of significant fact witnesses, working with Orion's industry

12  expert, cross-examining Defendant Meade's principal at trial, undertaking the direct examination of

13  Orion's technical expert, and supporting Orion' judgment collection efforts.

14         23.     Mr. Fisher billed 2,612.7 efficient hours in this matter through December 31, 2019,

15  totaling $1,225,897.50 in fees.

16         24.     **Andrea Hasegawa** is an attorney at my firm.  Ms. Hasegawa graduated with honors

17  from the University of Chicago Law School in 1999.  After law school, Ms. Hasegawa practiced as

18  an associate in the antitrust and commercial litigation groups at Sheppard, Mullin, Richter and

19  Hampton LLP and Morrison & Foerster LLP before joining BraunHagey & Borden LLP.  Her

20  standard billing rate is $450 per hour.  It is the standard rate clients actually pay for Ms.

21  Hasegawa's services, and it is the rate that Orion is paying for Ms. Hasegawa's services in the

22  instant case.

23         25.     Ms. Hasegawa assisted with the research and drafting of numerous significant briefs

24  in this case, including summary judgment and *Daubert* briefing, motions *in limine*, and briefing

25  regarding the numerous discovery disputes in this litigation.

26         26.     Ms. Hasegawa billed 387.70 efficient hours in this matter through December 31,

27  2019, totaling $174,160.00 in fees.

28

27. **Kristof Szoke** is an associate at my firm. Mr. Szoke graduated with honors from the Washington University in St. Louis School of Law, and then practiced at Latham & Watkins LLP before joining BHB. Mr. Szoke's standard billing rate is $425 per hour, which is the rate clients actually pay.

28. Mr. Szoke assisted with pretrial preparations and exchanges, as well as the research and drafting of numerous significant briefs in this case, including numerous motions *in limine*, Orion's motion to compel the testimony of Peter Ni. Mr. Szoke also provided research and drafting support during trial.

29. Mr. Szoke billed 268.65 efficient hours in this matter through December 31, 2019, totaling $114,176.25 in fees.

30. **Jessica Taran** is of counsel at BHB. Ms. Taran specializes in judgment collection and enforcement. Ms. Taran's standard billing rate is $425 per hour, which is the rate clients actually pay.

31. Ms. Taran has been assisting with Orion's judgment enforcement and collection efforts.

32. Ms. Taran billed 50.3 efficient hours in this matter through through December 31, 2019, totaling $21,277.50 in fees.

33. **Eva Schueller** is a former associate at my firm. She clerked for the Honorable Mary M. Schroeder in the Ninth Circuit Court of Appeals. She previously worked for the Department of Justice in Washington D.C. and spent several years at Morrison & Foerster, LLP before joining BHB. Her standard billing rate during her work on this case was $525 per hour, which is the rate clients actually paid for her services.

34. Ms. Schueller conducted extensive prefiling research and investigation of Orion's claims, including interviewing witnesses, fact-gathering, researching the telescope market, and researching numerous legal and factual issues in support of Orion's pleadings. Once the case commenced, Ms. Schueller assisted with legal research supporting Orion's opposition to Defendants' motion to dismiss, managed discovery, and assisted with Orion's initial disclosures.

35.     Ms. Schueller billed 121.4 efficient hours to this matter through December 31, 2019, totaling $63,735.00 in fees.

36.     **Lauren Zweier** is a former associate at my firm.  She graduated from the University of Michigan Law School and worked for several years at Wilson Sonsini Goodrich & Rosati before joining BHB. Her standard billing rate during her work on this case ranged from $425 to $450 per hour.

37.     Ms. Zweier assisted with propounding and responding to written discovery, meeting and conferring regarding Defendants' unilateral decision to not provide discovery pending the Court's motion to dismiss ruling, preparing for a scheduled 30(b)(6) deposition, researching and drafting Orion's first amended complaint, and preparing for a scheduled mediation.

38.     Ms. Zweier billed 190.1 efficient hours in this matter through December 31, 2019, totaling $143,780.00 in fees.

39.     **Diane Lu** is a former associate at my firm.  She graduated from Boston University School of Law in 2015.  Her standard billing rate during her work on this case was $425 per hour.

40.     Ms. Lu assisted with legal research and drafting in support of Orion's opposition to Defendants' motion to dismiss Orion's first amended complaint, as well as research and drafting regarding several discovery disputes.

41.     Ms. Lu billed 84.75 efficient hours in this matter through December 31, 2019, totaling $36,018.75 in fees.

42.     **Taylor Altman** is a former associate at my firm.  She graduated from Boalt Hall in 2016 and served as an editor on the *California Law Review*.  Her standard billing rate during her work on this case was $425 per hour.

43.     Ms. Altman assisted with preparation for the hearing on Defendants' motion to dismiss Orion's first amended complaint, and conducted legal and factual research in support of Orion's successful motion for sanctions (among other discovery disputes) and assisted with the supplementation of Orion's written discovery.

44.     Ms. Altman billed 74.0 efficient hours to this matter through December 31, 2019, totaling 31,450.00 in fees.

45.     To help reduce costs, our firm sometimes uses contract attorneys for legal research and writing.  **Molly Tullman**, **Tom Nanney**, **Elena Roberts**, and **Anne Radford** are all former big firm lawyers, whom Orion engaged as contract attorneys through our firm.  Ms. Tullman's rate paid by Orion was $450 per hour; Mr. Nanney, $400 per hour; and Ms. Radford and Ms. Roberts were billed at $225 per hour.

46.     Ms. Tullman assisted with legal research and drafting regarding Orion's opposition to Defendants' motion to dismiss Orion's original complaint.  Mr. Nanney assisted with legal research and drafting of a motion to compel production of documents from a third-party pursuant to a subpoena.  Ms. Radford and Ms. Roberts assisted with document and privilege review of Orion's extensive

47.     Ms. Tullman billed 31.5 efficient hours in this matter through December 31, 2019, totaling $14,175.00 in fees.

48.     Mr. Nanney billed 13.9 efficient hours in this matter through December 31, 2019, totaling $5,560.00 in fees.

49.     Ms. Radford billed 20.3 efficient hours in this matter through December 31, 2019, totaling $4,567,50 in fees.

50.     Ms. Roberts billed 106.2 efficient hours in this matter through December 31, 2019, totaling 23,895.00 in fees.

51.     **Paralegals and Legal Assistants.** Our legal assistants and paralegals support our attorneys and handle numerous tasks like managing the uploading of documents into our e-discovery systems, conducting requested searches within those documents and systems, categorizing and tracking documents as requested by attorneys, assisting with court filings, organizing and summarizing voluminous financial and shipping records, creating chronologies of key events, and preparing and organizing voluminous documents for trial, hearings, and depositions.

52.     **Katie Kushnir** is a paralegal at my firm.  Her standard billing rate is $225 per hour, and is the rate that clients actually pay.  Ms. Kushnir billed 532.6 efficient hours in this matter through December 31, 2019, totaling $119,585.00 in fees.

53. **Victoria Tong** is a paralegal at my firm. Her standard billing rate is $195 per hour, and is the rate that clients actually pay. Ms. Tong billed 776.9 efficient hours in this matter through December 31, 2019, totaling $150,421.75 in fees.

54. **Laura Verga** is a paralegal at my firm. Her standard billing rate is $175 per hour, and is the rate that clients actually pay. Ms. Verga billed 602.6 efficient hours in this matter, totaling $105,445.00 in fees.

55. **Cameron Baker** is a legal assistant at my firm. His standard billing rate is $175 per hour, and is the rate that clients actually pay. Mr. Baker billed 105.80 efficient hours in this matter, totaling $18,515.00 in fees.

56. **Charles Vallejo-Anderson** was a senior legal assistant at my firm. His standard billing rate was $275 per hour, and is the rate that clients actually paid. Mr. Vallejo-Anderson billed 83.0 efficient hours in this matter, totaling $18,515.00 in fees.

57. As shown below, the total fees Orion incurred in this case totaled **$4,425,963.00**. As noted above, this figure excludes over **$122,000** of BHB time that I wrote off pursuant to my billing judgment. To further ensure that BHB's fee application reflects efficient billing, I have reduced our fee requested by an additional five percent (**$221,298.15**), for a total reduction of over **$343,000**.

**B. Summary of Legal Fees and Costs**

58. As set forth below, Orion seeks reimbursement from Ningbo Sunny in the amount of **$4,982,781.87**. This amount reflects Orion's reduced attorneys' fees of **$4,204,664.85**, and expenses and costs totaling **$778,117.02**.

**1. Orion's Attorney's Fees**

59. Orion's total attorney's fees and fees sought in this application are set forth in the following table:

| Timekeeper | Hours | Fees |
|---|---|---|
| **J. Noah Hagey** | 962.00 | $756,860.00 |
| **Matthew Borden** | 1543.10 | $1,107,112.50 |

| | | |
|---|---|---|
| Jeffrey Theodore | 385.45 | $279,633.75 |
| Ronald Fisher | 2826.80 | $1,327,595.00 |
| Andrea Hasegawa | 343.80 | $154,405.00 |
| Kristof Szoke | 268.65 | $114,176.25 |
| Jessica Taran | 18.30 | $7,777.50 |
| Eva Schueller | 121.40 | $63,735.00 |
| Lauren Zweier | 190.10 | $82,200.00 |
| Diane Lu | 84.75 | $36,018.75 |
| Taylor Altman | 74.00 | $31,450.00 |
| Molly Tullman | 31.50 | $14,175.00 |
| Tom Nanney | 13.90 | $5,560.00 |
| Elena Roberts | 106.20 | $23,895.00 |
| Anne Radford | 20.30 | $4,567.50 |
| For Katie Kushnir | 532.60 | $119,585.00 |
| Victoria Tong | 776.90 | $150,421.75 |
| Laura Verga | 602.60 | $105,455.00 |
| Cameron Baker | 105.80 | $18,515.00 |
| Charles Vallejo-Anderson | 83.00 | $22,825.00 |
| **Total Fees** | **9,363.75** | **$4,425,963.00** |
| *Five Percent Write-Off* | | $221,298.15 |
| **Total Fees Sought** | | **$4,204,664.85** |

### 2. Expenses

60. Appended hereto as **Exhibit 1** is a true and correct copy of a report created and maintained by BHB detailing Orion's expenses in this litigation. These expenses include experts, jury consultants, translation services, court reporters and videographers, transportation, lodging, meals, and other expenses ordinarily incurred and paid by clients in litigation to further their interests. As reflected in **Exhibit 1**, Orion seeks reimbursement of **$778,117.02** of litigation expenses incurred in this matter.

### 3. Reasonableness of Fees and Expense

61. This was a hard-fought, highly complex antitrust litigation. To prevail in this action, Orion had to: conduct a lengthy investigation prior to filing the Complaint; prepare and file initial and amended pleadings; oppose two motions to dismiss; take and defend numerous depositions, including of non-English speakers (including taking many of those depositions a second time as a result of the Court's orders sanctioning Defendants for withholding discovery); bring review and organize nearly 6.5 million pages of documents, many of which were written Mandarin and required translation; meet and confer and file twelve discovery dispute letters to obtain Judge DeMarchi's assistance to obtain relief from Defendants' misconduct in discovery; oversee Orion's experts preparing reports on complex economic concepts and telescope manufacturing; analyze and challenge the work of Defendants' experts (including by successfully moving to exclude one of Defendants' experts); move for summary judgment and oppose Defendants' motion for summary judgment; prepare and file *Daubert* motions (one of which prevailed), prepare for and conduct a six-week jury trial; and brief post-trial motions, including this motion for fees and costs.

62. Unlike many antitrust cases in which private plaintiffs 'piggyback' on prior litigation or investigations brought by the Department of Justice, Orion developed and prosecuted this case entirely on its own. The fees and expenses presented here are the fees and expenses that Orion actually incurred in the prosecution of this case, a three year-plus legal struggle against a well-funded adversary who employed big law firms, first Mayer Brown, and then Sheppard Mullin, a firm that has more than 800 lawyers around the world. Defendants here repeatedly sought to delay and frustrate the efficient resolution of this litigation. Orion's perseverance resulted in total victory and a significant benefit to the telescope market and telescope consumers.

63. Given the complex nature of this case, Orion's fees and costs are very reasonable. There can be no better evidence of this fact than Meade's bankruptcy filings, which reveal that for its defense of the case alone, Sheppard Mullin charged Defendants **over $9,000,000** in fees and costs defending this action. Attached hereto as **Exhibit 2** is a true and correct copy of one such filing.

64.     Orion's fees and costs are also reasonable in light of the manner in which Defendants chose to litigate this case.  Defendants caused Orion to incur additional costs and fees by:

- Refusing to produce documents responsive to Orion's discovery requests while their Motions to Dismiss were pending;

- Repeatedly representing to Orion and the Court that they had completed their document production, only to repeatedly supplement their production weeks later with tens or hundreds of thousands of additional pages of responsive materials, many of which were in Chinese, after the deadlines for initial and supplemental productions had passed;

- Representing that their production was complete before they had even searched the files of Ningbo Sunny's CEO, Peter Ni;

- Repeatedly withholding crucial documents and information that were damaging to their case without justification, including *direct evidence of collusion* (an email in which an executive of Meade admitted that Defendants were planning to cooperate with their purported competitors for the benefit of the entire group);

- Withholding highly relevant and damaging documents until after key depositions of witnesses named in those documents and refusing to allow Orion to further depose those witnesses about the late-produced documents;

- Withholding documents on privilege grounds when there was not even a colorable argument for doing so; and

- Providing misleading and evasive responses to written discovery.

In marked contrast, not a single motion to compel was filed against Orion during this entire case.

**C.     Conclusion**

65.     Pursuant to the above, Orion respectfully requests that the Court award **$4,204,664.85**, representing BHB attorneys' fees of **$4,204,664.85** and expenses and costs of **$778,117.02**.

66.     In accordance with Northern District of California Civil Local Rule 54-5(a), Mr. Borden and Mr. Fisher met and conferred with counsel for Defendants on December 12, 2019, and

1   attempted to resolve all disputed issues relating to this Orion's Motion for Attorneys Fees and

2   Costs.  We were not able to resolve our differences in the meet and confer process.

3

4            I declare under penalty of perjury under the laws of the United States that the foregoing is

5   true and correct.

6   Dated: January 16, 2020                              /s/ J. Noah Hagey
7                                                        J. Noah Hagey, Esq.